FIRST CHICAGO CORPORATION, PETITIONER *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 11174-87.     Filed March 7, 1991.

*John L. Snyder, Paul S. Caselton, Marilyn D. Franson,* and *Francis O. McDermott,* for the petitioner.

*Beth L. Williams* and *Michael L. Boman,* for the respondent.

GERBER, *Judge:* Respondent, in a notice of deficiency dated February 4, 1987, determined a $3,993,041 deficiency in petitioner's 1983 corporate income tax. The issue considered in this opinion concerns petitioner's foreign tax credit.[1] In conjunction with respondent's 1983 determination, petitioner's taxable years 1978 through 1982 have some bearing on this issue because of the effect of the foreign tax credit carryover from those years to 1983. The specific foreign tax area under consideration is whether petitioner and/or its affiliated group is entitled to the section 902(a)[2] deemed paid foreign tax credit.

## FINDINGS OF FACT

### General Background

Petitioner, First Chicago Corp. (P),[3] is a bank holding company organized in 1969 with its principal place of business in Chicago, Illinois. P, as the common parent, filed the 1978 through 1983 consolidated returns and the petition in this case on its own behalf and on behalf of the members of its affiliated group. The consolidated group elected the application of the foreign tax credit. The First National Bank of Chicago (S), a national banking corporation, is P's principal subsidiary and P and S also had several other wholly owned subsidiaries engaged in banking-related, financial, investment and asset management, data processing, real estate, and other business activities. S, during the years under consideration, was ranked as the fourth largest American bank. P and its subsidiaries also had subsidiaries

---

[1] The parties have resolved all but two issues determined in the notice of deficiency. One of the unresolved issues is assigned to Judge Julian Jacobs and was addressed separately from the issue covered by this opinion in *First Chicago Corp. v. Commissioner,* T.C. Memo. 1991-44, filed Feb. 5, 1991.

[2] Section references are to the Internal Revenue Code as amended and in effect for the taxable and related years under consideration. Rule references are to the Tax Court Rules of Practice and Procedure.

[3] Alphanumeric characters have been used for purposes of simplicity and clarity because of the somewhat similar acronyms formed by the initials of the various interrelated affiliated entities.

and branch operations conducting business in foreign countries.

S and certain of its affiliates held stock in foreign banks, including N.V. Slavenburg's Bank (F). During the years under consideration the following affiliates owned F stock: S, First Chicago International Finance Corp. (S-1), First Chicago International—Los Angeles (S-2), First Chicago International Banking Corp. (S-3), First Chicago Delaware (S-1-1), and First Chicago Investment Corp. (P-1-1). S-1, S-2, and S-3 were wholly owned "Edge Act[4] subsidiaries" of S. S-1-1 was a wholly owned subsidiary of S-1. P-1-1 was a wholly owned subsidiary of First Chicago Financial Corp. (P-1), which in turn is a wholly owned subsidiary of P.

Certain affiliated members of P's consolidated group claimed foreign tax credits under section 902(a), as follows:

| Member | 1978 | 1979 | 1980 |
|---|---|---|---|
| S | $541,346 | $594,782 | $241,738 |
| S-1 | 93,370 | 102,173 | 37,277 |
| S-2 | 1,404 | 1,537 | 561 |
| S-3 | 1,404 | 1,537 | 562 |
| P-1-1 | 1,404 | 1,537 | 561 |
| Total foreign credit claimed under sec. 902 | 638,928 | 701,566 | 280,699 |

The above affiliates also reported equivalent amounts under section 78 as "gross-up" income. Respondent disallowed all of the above-listed credits and correspondingly determined a decrease in the amount of "gross-up" income. Because of an audit conducted by the Government of The Netherlands, subsequent to P's claim of the above-listed credits, the total foreign credits in dispute are now $348,934, $464,357, and $2,155,240 for 1978, 1979, and 1980, respectively. The foreign income taxes paid by F to The Netherlands are creditable foreign taxes within the meaning of section 901. Additionally, F paid the foreign taxes, as adjusted by the foreign tax audit, with respect to accumulated profits from which the dividend distributions were made.

---

[4]Corporations organized for the purpose of engaging in international or foreign banking and financial operations within the limitations prescribed in sec. 25(a) of the Federal Reserve Act, 12 U.S.C. secs. 611-631, are governed by Regulation K of the Board of Governors of the Federal Reserve System. Additionally, these corporations are required to maintain $2 million in capital.

## S's Entry Into Foreign Markets

During the 1970s and 1980s, S had direct offices in 41 countries. At the end of 1979, S had overseas branches in 19 foreign cities/countries and 6 foreign subsidiaries. Additionally, S-1 (S's subsidiary) had 7 foreign subsidiaries. This was the result of an early 1960s trend for U.S. banks to expand into international markets. At that time, the international banking business was principally involved in the financing of the movement of goods in international trade and Rotterdam, The Netherlands, was the largest world port with a large volume of international goods. During that period, S was rapidly expanding its international business and representation in The Netherlands was considered important. Because of perceived employment and provincial problems, S decided to acquire shares of stock in a Dutch bank, rather than open a branch office in The Netherlands.

## Background Concerning F

Stock was acquired in F, a public Dutch corporation located in Rotterdam. F maintained offices throughout The Netherlands and also in three other European cities/countries. F, under Dutch law, was permitted to issue only voting stock, and it issued only one class of voting stock. Under its articles of association, F was to be managed on a day-to-day basis by a management board[5] of two or more (amended July 1, 1980, to "at least three") managing directors. The managing directors were appointed by the board of directors (the board), who also could remove a managing director. The board of directors was responsible for the supervision of the policy of the managing directors and the general course of affairs of the company. Additionally, F, as a "structure company,"[6] permitted its board of directors to exercise certain functions usually vested in a

---

[5]The term "managing directors" is translated from the Dutch word "Directeuren." The term "board of directors" or "board of supervisory directors" is translated from the Dutch words "Raad van Commissarissen." The term "committee of the board of directors" is translated from the Dutch words "Raad van Toezicht."

[6]A Dutch "structure company" differs from a standard company in that a standard company appears to vest more authority in the shareholders and less in its board of directors, whereas a structure company has more authority vested in its board. It also appears that the structure company is more closely regulated and/or supervised by government or governmental agencies.

general meeting of shareholders. Some of those functions included approval: To issue unissued shares of stock, for acquisition of treasury stock, to name the president of the managing directors, to render the company's annual accounts, of the distribution of a dividend, of a motion to amend the articles of association, and to propose to wind up the company.

The board could appoint a committee of the board of directors. That committee (a smaller version of the board) is more active and supervised the managing directors on a day-to-day basis. The board was also able to elect its own members, i.e., if there was a vacancy on the board. The shareholders' meeting, the Works Council,[7] and the managing directors were entitled to recommend persons to be appointed to the board. The board could appoint a member, even over the objection of a majority of a general meeting of the shareholders or the Works Council, if on appeal to the Social and Economic Council the objection was determined to be unfounded. Such objections are rare and, overall, only about seven had occurred from 1971 up until the time of trial.

General meetings of shareholders were to be held at a time specified by the board or managing directors. An annual general meeting of the shareholders was required by the articles of association. If at least 10 shareholders representing at least one-tenth of the issued shares joined in a request, a special general meeting could be called. A shareholder was entitled to admission at a general meeting, provided that shares held in bearer form were evidenced by a receipt showing that the share certificate had been deposited at a specified place, as required in the notice of the meeting. If a shareholder held registered shares, there was a requirement that the board be notified at least 3 days before the meeting of intention to attend the meeting.

Voting rights were based upon the following standards:

| Number of shares | Number of votes |
|---|---|
| 1 - 40 | 1 |
| 41 - 80 | 2 |
| 81 - 120 | 3 |

---

[7] The Works Council and Social and Economic Council are apparently public bodies which oversee certain activities of companies.

| Number of shares | Number of votes |
|---|---|
| 121 - 160 | 4 |
| 161 - 200 | 5 |
| 201 or more | 6 |

Certain Dutch corporate practices are intended to limit voting rights of shareholders by preventing large shareholders from controlling the voting power. F's articles of association contained one in the form of a voting limitation, as reflected above. Only a small percentage of Dutch corporations have this type of limitation. This type of voting restriction has resulted in practices where large shareholders attempt to spread their shares amongst friends and relatives to avoid the limitation.

### Agreements Between S and F

The relationship between S and F was established by means of a series of letter agreements, beginning September 9, 1966 (66 agreement), wherein S and its subsidiaries agreed with F that F would sell 2,860 shares of its stock (representing 11 percent of total issued capital stock) for U.S. $1,404,000. The agreements refer to S and its subsidiaries even though it was originally intended to name S-1 as the sole shareholder. Under the 66 agreement, S,[8] the buyer, would be entitled to purchase, on a pro rata basis, sufficient shares to maintain an 11-percent ownership interest. S and its subsidiaries agreed, so long as there were fewer than 15 board members, not to directly or indirectly purchase shares of F, other than under the agreement. The 66 agreement also recited that S "shall have one director of its choice on the Board of Directors of [F] so long as there be less than fifteen directors * * * and · * * * two directors * * * whenever the total number of directors shall be fifteen or more."

In addition, the 66 agreement required S to give 6 months' notice of intention to sell F stock, and F had the right to repurchase shares from S or to arrange for sale to other parties acceptable to F. S was entitled to "any and all information regarding the affairs of [F] and its affiliates"

---

[8] Use of "S" in the general context of these agreements includes reference to various subsidiaries of S and P which were also involved.

which would be made "available in accordance with the Articles of Association of [F] and the Dutch Law." S was provided office space at F's head office. Dutch law was to govern the agreement.

By a January 12, 1967, agreement (67 agreement), the 66 agreement was modified in that the initial number of F's shares to be purchased was increased to 2,913 and the price was to be increased to approximately U.S. $1,405,500 to account for a 2-percent stock dividend paid in 1967 and in order to maintain S and its affiliates' stock ownership at about 11 percent.

By a July 23, 1971, agreement (71 agreement), S and its subsidiaries agreed to increase its shareholdings from 11 percent to 1 share more than 20 percent by the purchase of 4,965 shares of F stock. The 66 agreement, as modified, was generally to remain in effect with respect to other terms. Additionally, S agreed to attempt to solicit business for F, F agreed to provide additional space for S in one of F's branch banks in a second city, and an S board member or designee was to sit in a nonvoting capacity on the committee.

By an undated 1972 agreement (72 agreement), the series of agreements was modified, as follows: S agreed to permit F's management to maintain its "Dutch nationality" and to remain independent; S agreed to give F 2 years' notice before attempting to sell shares; S agreed not to attempt to vote its shares to effect a majority; and S was permitted to transfer as many shares as necessary to provide it with voting power equivalent to at least 10.1 percent of votes eligible to be cast at any shareholder meeting, but S agreed that it would not exercise more than 20 percent of eligible votes at any such meeting.

S's management wanted more control in the operation of F. F had extended large amounts of credit without consulting with S. S prepared a list of items to be discussed with F, including credit approval, problem loans, budgets and long-range forecasts, internal control procedures, and business development strategies. In a June 16, 1976, letter to F, S gave notice of its intention to divest its F shares. S advised that the divestiture was because S wanted and had not received active representation in F's management. S also advised that it preferred to operate its own foreign

branches and that S's investment in F was perceived by S as hindering the Federal Reserve Board's approval of applications for wholly owned or controlled foreign banking activities. This letter started the 2-year notice period set forth in the 72 agreement.

On December 1, 1977, F and S (and its subsidiaries) entered into a new agreement (77 agreement), which superseded prior agreements and which remained in effect throughout the taxable years under consideration. The June 16, 1976, letter concerning divestiture was referenced, but it was now agreed that S would retain an 11-percent ownership of F. Until June 16, 1978, F was entitled to purchase its shares that were in excess of S's 11-percent holding from S and its subsidiaries at a price acceptable to the seller. After June 16, 1978, S retained the sole discretion to sell F shares in excess of the 11-percent level, with F having a first right of refusal during a 6-business-day period. If S wished to reduce its F shareholdings below 11 percent, F was to receive notice and would then have 365 days to purchase or cause another to purchase at a price acceptable to S. After the 365-day period, S had the right to sell, subject to F's right of first refusal, for a 6-business-day period.

The 77 agreement also provided S with a preemptive right to purchase, on a pro rata basis, shares to maintain its 11-percent ownership in F. The 77 agreement contained other terms, as follows: S was allowed to transfer shares within or outside its organization to maximize its voting power; F would not amend bylaws regarding voting rights without the written consent of S; S was to have the right to select 1 board member if the board was composed of fewer than 15, and 2 members if composed of more than 15; S, until ownership was reduced to an 11-percent level, would have a nonvoting member on the committee; S and F would hold monthly meetings to ensure that each party's activities were mutually compatible; F agreed to provide all information reasonably necessary pertaining to F; S was to continue to occupy office space in F's facilities in 2 cities; S agreed that F would continue to be an autonomous Dutch bank and that S would not attempt to control or direct F's banking policies or operations except in its status as a

shareholder; S obtained the right to open direct branches in The Netherlands. All provisions of the 77 agreement remained in effect so long as S and its affiliates held 11 percent or more of F stock outstanding (or, if reduced solely by its sale of stock dividends, then if S and its affiliates held 10 percent or more of the outstanding stock). If S and its affiliates' holdings fell below those levels, all provisions except those governing S's right to sell F"s stock were canceled. Under the terms of the 77 agreement, S attempted to obtain and protect its fair share of voting power and influence on the board.

### S's Acquisition of F Stock

Under the 66 agreement, S purchased 2,860 shares of F stock, representing about 11 percent of the then-outstanding shares. S sought and obtained the approval of the Federal Reserve Board of Governors in connection with the purchase of the 2,860 shares of F stock. The Federal Reserve Board of Governors was less concerned with which entity within P's organization held the shares than with the safety and soundness of the investment in the foreign entity. All of S's senior management was involved in the negotiations to acquire F shares and it was the largest acquisition S had ever made of an interest in another bank. Under the 67 agreement, the number of shares was increased to 2,913 to account for a stock dividend and to maintain about 11-percent ownership.

At the time of the original negotiations in 1966, a national bank could acquire foreign bank shares only through an "Edge Act corporation." The initial plan was to have S-1 acquire the shares. A 1967 amendment to the Federal statutes, that occurred during the time of the negotiations, made it legally possible for a national bank to purchase foreign bank shares in its own name.

As of June 10, 1971, the separate and total shares of F held by S and its affiliate were as follows:

| Description | S | S-1 | Total |
|---|---|---|---|
| Ownership in 1967 | 2,888 | 25 | 2,913 |
| Purchases, stock dividend, intra-group transfers | 1,521 | 2 | 1,523 |
| Total shares, June 10, 1971 | 4,409 | 27 | 4,436 |

Under the 71 agreement and considering a 2-percent stock dividend, 4,965 additional shares were acquired, increasing total ownership to 9,401, representing 20 percent of the 47,000 shares of F stock outstanding, as follows:

| Description | S | S-1 | Total |
|---|---|---|---|
| Ownership in 1967 | 4,409 | 27 | 4,436 |
| Additional shares - 1971 | 4,965 | - - - | 4,965 |
| Total shares, July 23, 1971 | 9,374 | 27 | 9,401 |

After that point in time, the number of shares of F outstanding increased and the shares changed hands between S and its affiliates. Some of the relevant events include: On or about April 4, 1972, S transferred 25 shares each (50 shares total) of F to S-3 (a subsidiary of S) and P-1-1 (a subsidiary of P's subsidiary and affiliate of S); on June 8, 1973, S-1 (a subsidiary of S) sold 1,240 shares of F to S-1-1 (a subsidiary of S's subsidiary); on June 11, 1974, S transferred 5,154 shares to S-1, which in turn transferred 5,716 shares to S-1-1; on December 22, 1975, S-1-1 sold all its shares in F to S-1 (9,572 shares) and S-2 (25 shares); in February 1978, S-1 sold 74,500 shares of F stock to F in connection with the 77 agreement. These and other transfers were made for different reasons, sometimes for purposes of voting power and other times for other business purposes.

The shares of F were held by S and its affiliates as of December 31 of 1977 through 1980, as follows:

| | Number of shares as of Dec. 31 | | | |
|---|---|---|---|---|
| Shareholder | 1977 | 1978 | 1979 | 1980 |
| S | 96,360 | 96,750 | 107,767 | 114,026 |
| S-1 | 91,120 | 16,620 | 16,620 | 16,620 |
| S-2 | 250 | 250 | 250 | 250 |
| S-3 | 250 | 250 | 250 | 250 |
| P-1-1 | 250 | 250 | 250 | 250 |
| Total | 188,230 | 114,120 | 125,137 | 131,396 |
| No. of F shares outstanding | 988,050 | 1,037,452 | 1,189,476 | 1,278,950 |
| Percent of F owned by S and affiliates | 19.05 | 11.00 | 10.52 | 10.27 |

The percentage shareholdings by each entity and the total percentage shareholdings, as stipulated, were as follows:

| Shareholder | Percentage of voting stock as of Dec. 31 | | | |
|---|---|---|---|---|
| | 1977 | 1978 | 1979 | 1980 |
| S | 9.75% | 9.33% | 9.06% | 8.92% |
| S-1 | 9.22 | 1.60 | 1.40 | 1.30 |
| S-2 | 0.02 | 0.02 | 0.02 | 0.02 |
| S-3 | 0.02 | 0.02 | 0.02 | 0.02 |
| P-1-1 | 0.02 | 0.02 | 0.02 | 0.02 |
| Total percentage | 19.05 | 11.00 | 10.52 | [9]10.27 |

The discrepancies between the individual percentages referenced above and the totals are due to rounding.

At all times during the taxable years 1977 through 1980, the five members of the affiliated group, when considered together, owned more than 10 percent of the outstanding shares of F stock. At all times during the taxable years 1977 through 1980, no member of the affiliated group owned more than 9.75 percent of the outstanding shares of F stock. S and its affiliates were, at all times during 1978 through 1980, collectively, the largest block of shareholders in F. Additionally, S was a large creditor of F, with lines of credit between $45 and $50 million during the years under consideration. S obtained no benefit by maintaining its holding of F shares at less than 10 percent, and the holdings were diversified in order to maximize voting power over F and its operations. Also, the affiliated group made sure that the total shareholdings between them exceeded 10 percent. The shareholdings and some of the conditions of the various letter agreements were generally known to F's management and there was no attempt to limit the knowledge of the agreements and conditions between F and S and its affiliates.

During 1981 each affiliate of P holding F shares sold approximately 50.5 percent of its holding to Credit Lyonnais Bank Nederland N.V. (Credit). Later S-1, S-2, S-3, and P-1-1 sold all of their remaining shares to Credit. At the same time, S sold additional F shares to Credit and continued to do so monthly, until March 1986 when S had completely divested itself of F shares.

---

[9]The 1980 total percentage adds up to 10.28, whereas the parties represented the total as 10.27.

The cost, sale price, and fair market value of dividends of F shares to each affiliate as of May 31, 1980, were as follows:

| Affiliate | Cost | Sale price | Dividend |
|-----------|------|-----------|----------|
| S | $10,896,274 | $5,860,766 | $4,358,638 |
| S-1 | 11,254,887 | 11,296,148 | 1,258,821 |
| S-2 | 18,154 | 6,578 | 6,766 |
| P-1-1 | 13,955 | 9,179 | 11,356 |
| S-3 | 13,955 | 9,179 | 11,356 |
| S-1-1 | 6,403,722 | 7,107,794 | 704,072 |
| Totals | 28,600,947 | 24,289,644 | 6,351,009 |

The following amounts represent the dividends reported with respect to the F shares for 1977 through 1980:

| Affiliate | 1977 | 1978 | 1979 | 1980 |
|-----------|------|------|------|------|
| S | $350,712 | $433,761 | $541,819 | $724,710 |
| S-1 | 331,640 | 74,814 | 93,075 | 111,765 |
| S-2 | 910 | 1,125 | 1,400 | 1,681 |
| S-3 | 910 | 1,125 | 1,400 | 1,681 |
| P-1-1 | 910 | 1,125 | 1,400 | 1,681 |
| Totals | 685,082 | 511,950 | 639,094 | 841,518 |

The following amounts represent the fair market values of the stock dividends received during 1977 through 1980:

| Affiliate | 1977 | 1978 | 1979 | 1980 |
|-----------|------|------|------|------|
| S | $443,456 | $552,178 | $557,532 | $603,925 |
| S-1 | 419,341 | 95,238 | 95,774 | 93,138 |
| S-2 | 1,151 | 1,433 | 1,441 | 1,401 |
| S-3 | 1,151 | 1,433 | 1,441 | 1,401 |
| P-1-1 | 1,151 | 1,433 | 1,441 | 1,401 |
| Totals | 866,250 | 651,715 | 657,629 | 701,266 |

## S and Its Affiliates' Involvement with F

W.R. Anker (Anker), a senior vice president of S, was designated to be S and its affiliates' member on F's board during the taxable years 1978, 1979, and 1980. Anker's salary was paid by S and he was also a member of the board of directors of a subsidiary of S. His overall responsibility was as area head for Continental and Eastern Europe, responsible for all branches, subsidiaries, and affiliated banks in Europe, the Soviet Union, and Israel. Anker served on F's board until 1981 and the sale of F

shares to Credit. Anker attended most meetings of F's board and a substitute would be sent when Anker was unable to attend. F's board met six or seven times per annum. Anker also attended, as a nonvoting member, F's supervisory board meetings, which usually took about 2 hours. Anker was deeply involved in F's business policies and also attended the monthly coordinating meeting between S and F. Overall, Anker spent about 25 percent of his time involved in matters concerning F.

The following reflects the total number of votes cast, the total number cast by S and its affiliates, the number cast by S and each affiliate separately, and the percentage of S and its affiliates' total votes to the total votes cast at F's annual meeting for 1978, 1979, and 1980:

| | | S & Affiliates | | | | | | |
|---|---|---|---|---|---|---|---|---|
| *Date* | Total cast | Total | Percent | S | S-1 | S-2 | S-3 | P-1-1 |
| 4/26/78 | 118 | 12 | 10.2 | 6 | 6 | | | |
| 4/27/79 | 189 | 30 | 15.9 | 6 | 6 | 6 | 6 | 6 |
| 4/25/80 | 171 | 30 | 17.5 | 6 | 6 | 6 | 6 | 6 |

For the April 26, 1978, annual meeting, S and its affiliates did not cast all of their potential votes and if all had been voted and no other F shareholders had voted, S and its affiliates' percentage would have been 22 percent of the total then cast.

Shareholders were not entitled to attend and/or vote their shares at a shareholders' meeting unless proper notice of an intention to attend had been provided. During the years under consideration, Anker, as S and its affiliates' representative, was not concerned about the number of S and its affiliates' votes cast falling below the 10-percent level, because he was able to monitor the shareholders who had provided notice and he had formulated fallback plans if the number of votes was short of the amount needed.

Three of S's subsidiaries (S-1, S-2, and S-3) were "Edge Act companies" for which quarterly meetings were held in S's International Banking Department in Chicago. The directors of those companies did not discuss how the F shares should be voted; instead, Anker decided how to vote them in the best interests of S. S-1, in operation, was merely a holding company possessing only a few filing

cabinets in the International Department in Chicago. S-1 had only one part-time clerk, who was also an employee of S, as its active employee and she did not have dealings with customers. The directors and officers of S-1 were also employees/officers of S. There were also common directors and officers between S, S's "Edge Act subsidiaries," and between the "Edge Act subsidiaries."

OPINION

The controversy here concerns a question of first impression involving the interpretation of the 10-percent requirement of section 902 and consideration of the interrelationship of section 902 with the consolidated return regulations under section 1502. We must specifically decide whether either or both of those provisions would permit petitioner to avail itself of the deemed foreign tax credit.

*General Background*

Section 901 provides for the allowance to a domestic corporation of a credit on certain foreign taxes paid or accrued during a taxable year to any foreign country or possession of the United States. Section 901 also provides, in the case of a corporate taxpayer, an allowance of a credit for taxes "deemed to have been paid under sections 902 and 960."

Section 902(a) for the years at issue provided:

SEC. 902(a). TREATMENT OF TAXES PAID BY FOREIGN CORPORATION.— For purposes of this subpart, *a domestic corporation which owns at least 10 percent of the voting stock of a foreign corporation* from which it receives dividends in any taxable year shall be deemed to have paid the same proportion of any income, war profits, or excess profits taxes paid or deemed to be paid by such foreign corporation to any foreign country or to any possession of the United States, on or with respect to the accumulated profits of such foreign corporation from which such dividends were paid, which the amount of such dividends (determined without regard to section 78) bears to the amount of such accumulated profits in excess of such income, war profits, and excess profits taxes (other than those deemed paid). [Emphasis supplied.]

Accordingly, section 902, in addition to the foreign tax credit for foreign tax actually paid or accrued by a domestic

taxpayer under section 901, imputes a credit, in certain circumstances, to domestic corporations for a proportionate (in relation to the domestic corporation's shareholdings) amount of tax paid by a dividend-paying foreign corporation.

*Section 902(a)—The Statute and Legislative History*

In the face of the statutory language "a domestic corporation which owns at least 10 percent of the voting stock of a foreign corporation," petitioner first argues that "The language of Treas. Reg. [section] 1.1502-4 and the rationale for section 902(a) together fully support treating the consolidated group as one entity for purposes of determining whether the 10% voting stock requirement of section 902(a) has been met." If we should hold otherwise, petitioner's alternative position is that, factually, S's affiliates held the shares as agents or nominees on behalf of S. Respondent counters that neither the language nor the intent of section 902(a) or the consolidated return regulations would permit aggregating the shares of affiliated corporate taxpayers in order to meet the qualifications of section 902(a). Respondent also argues that the facts indicate that S's subsidiaries and affiliates were not agents or nominees of S. Respondent also asserts that section 902(a) requires 10-percent voting power rather than 10 percent of the voting stock and that S and its affiliates did not have 10 percent of the voting power.

Petitioner argues that the legislative history supports aggregation under section 902(a). First, we consider whether the legislative history regarding section 902(a) should be consulted, and if consulted, whether it supports petitioner's argument that section 902(a) should be read to include an affiliated group.

Normally, there is:

no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes. Often these words are sufficient in and of themselves to determine the purpose of the legislation. In such cases we have followed their plain meaning.
* * *

*United States v. American Trucking Associations,* 310 U.S. 534, 543 (1940), and cases cited therein at n.18. When,

however, the meaning leads to absurd results or the results are "plainly at variance with the policy of the legislation as a whole," courts have followed the purpose, rather than the literal words of the statute. *United States v. American Trucking Associations, supra* at 543, and cases cited therein.

It is clear that the general congressional intent underlying sections 901 and 902 was to avoid double (foreign and domestic) taxation of foreign income and dividends by allowing a credit for certain taxes paid or deemed paid with respect to dividends received. Moreover, in the legislative history concerning the 1951 amendment to section 131(f)(1), I.R.C. 1939 (predecessor to section 902), that principle was reaffirmed, but the requirement that a domestic corporation own a majority of the voting stock of the foreign corporation was reduced to the current "ten percent or more" standard. S. Rept. 781, 82d Cong., 1st Sess. (1951), 1951 C.B. 458, 497.

Petitioner, however, asks us to focus upon what it considers to be part of the legislative history concerning the Revenue Act of 1918, ch. 18, 40 Stat. 1057. During floor debate of a 1918 Revenue Act predecessor of the current foreign tax credit sections, one Senator proposed the aggregation of related domestic taxpayers in order to meet the majority voting requirement (which was required at that time). The proposal did not, however, find its way into enacted legislation, and, to date, has not appeared as part of the statutory language. To the extent one would consider this to be material in the legislative history, it should not be denominated as a reflection of congressional intent because it reflects the view or proposal of only one Senator and, more importantly, was not incorporated in the resulting legislation. Accordingly, we find no express or implied congressional intent to include consolidated shareholdings or aggregation of shareholdings in order to meet the 10-percent-or-more threshold for application of section 902.

*Respondent's Revenue Ruling—*
*Retroactivity—Section 7805(b)*

Initially, we note that respondent's position with respect to this issue was set forth in Rev. Rul. 85-3, 1985-1 C.B.

222. The facts of the ruling are directly on point with the issue in this case. In the ruling, a parent and four subsidiaries, each of which owned 2-1/2 percent of the voting stock of a foreign corporation, were held not to have at least 10 percent of the voting stock for purposes of section 902. The rationale underlying the ruling is, in pertinent part, as follows:

Section 1.1502-4(c) provides that the foreign tax credit for the consolidated return year shall be determined on a consolidated basis under the principles of sections 901 through 905 and section 960.

Section 1.1502-34 of the regulations provides, in part, that for purposes of sections 1.1502-1 through 1.1502-80, in determining the stock ownership of a member of the group in another corporation (the "issuing corporation") for purposes of determining the application of section 165(g)(3)(A), 332(b)(1), 333(b), 351(a), or 904(f), in a consolidated return year, there shall be included stock owned by all other members of the group in the issuing corporation.

Section 1.1502-80 * * * provides that the Code, or other law, shall be applicable to an affiliated group to the extent the regulations do not exclude its application.

To be applicable, section 902(a) requires that the domestic corporation receiving the dividend be one which "owns" at least 10 percent of the voting stock of the foreign corporation. Generally, when the income tax laws require a person to own a certain percentage of voting stock, they mean "own" in the ordinary, common sense understanding of the term; that is, actual or outright ownership. *See, for example, Trotz v. Commissioner,* 361 F.2d 927 (10th Cir. 1966). Section 902(a) does not contain any indirect ownership provisions that make indirect ownership a part of actual or direct ownership. Indirect ownership is dealt with in section 902(b), but only in terms of attributing foreign taxes paid by indirectly owned foreign corporations to a domestic corporation, and not in terms of attributing one domestic corporation's ownership of a foreign corporation to another domestic corporation. [1985-1 C.B. 222-223.]

Respondent makes the same argument in this case and petitioner counters with several positions regarding section 902 and the consolidated return regulations. Should the Court find that the ruling contains the correct position on this matter, petitioner also argues that respondent should have exercised his section 7805(b) authority to prescribe that the ruling would be applied without retroactive effect.

Section 7805(b) permits the Secretary to prescribe that a ruling or regulation may be applied without retroactive effect. Rulings and regulations are presumed to apply retroactively unless otherwise specified. *Helvering v.*

*Reynolds,* 313 U.S 428 (1941); *Gehl Co. v. Commissioner,* 795 F.2d 1324, 1331-1332 (7th Cir. 1986); *Becker v. Commissioner,* 85 T.C. 291, 294 (1985). The Commissioner's failure to apply a ruling or regulation prospectively is reviewable only for an abuse of discretion. *Dixon v. United States,* 381 U.S. 68, 73 (1965); *Automobile Club v. Commissioner,* 353 U.S. 180, 183 (1957); *Gehl Co. v. Commissioner,* 795 F.2d at 1332.

Petitioner argues that generally, "retroactive application of a ruling or regulation will be considered an abuse of discretion if the ruling or regulation works an inequitable result with respect to a specific case or effects a change in existing law." Respondent counters that Rev. Rul. 85-3, *supra,* did not alter prior law and that, presumably, is irrespective of whether the result of the ruling is or is not inequitable. We agree with respondent that he did not abuse his discretion. The standard for deciding whether respondent abused his discretion includes consideration of inequities to the extent they are related to a taxpayer's justifiable reliance on prior settled law that is altered by the ruling or regulation, and whether retroactive application would create an inordinately harsh result. See *Gehl Co. v. Commissioner,* 795 F.2d at 1332; *CWT Farms, Inc. v. Commissioner,* 755 F.2d 790, 802 (11th Cir. 1985), affg. 79 T.C. 1054 (1982). The parties have pointed out that this issue is one of first impression. Accordingly, it is not likely that petitioner relied on settled law or that respondent's ruling altered the existing state of the law. Moreover, the literal language of section 902(a) does not support petitioner's position, and the language of the regulation most heavily relied upon (section 1.1502-4(c), Income Tax Regs.) is ambiguous. These factors lead us to the conclusion that respondent did not abuse his discretion by not prescribing that his ruling is to be applied without retroactive effect. This is not the type of situation where respondent published one position and then changed or modified it retroactively. See, e.g., *Gehl Co. v. Commissioner,* 795 F.2d at 1332-1333.

### *Effect of the Consolidated Return Regulations*

We now consider petitioner's contention that the section 1.1502 consolidated return regulations (consolidated regula-

tions) would permit the aggregation of affiliated or consolidated shareholders in order to meet the 10-percent or more threshold of section 902. The consolidated regulations are legislative in character and have the force and effect of law. *Union Electric Co. of Missouri v. United States,* 158 Ct. Cl. 479, 486, 305 F.2d 850, 854 (1962). To the extent they are not proven to be beyond the scope of authority delegated, inconsistent with the statute, or unreasonable, the regulations are valid and a taxpayer's consent to file a consolidated return may therefore preempt or modify the operation of other Code provisions. *Commissioner v. General Machinery Corp.,* 95 F.2d 759 (6th Cir. 1938); *Corner Broadway-Maiden Lane, Inc. v. Commissioner,* 76 F.2d 106 (2d Cir. 1935); *Commissioner v. South Texas Lumber Co.,* 333 U.S. 496, 501 (1948); *Bingler v. Johnson,* 394 U.S. 741 (1969). See *Valley Paperback Manufacturers, Inc. v. Commissioner,* T.C. Memo. 1975-311 (sec. 1.1502-76(d), Income Tax Regs., found to be valid).

Petitioner, in support of its aggregation position, relies upon section 1.1502-4(c), Income Tax Regs., which is part of a large body of legislative regulations promulgated under the congressional mandate of section 1502 to regulate the "privilege to file consolidated returns." Section 1.1502-4(c), Income Tax Regs., contains procedurally oriented guides for aggregating foreign tax credits generated by each affiliated member. It is procedural in nature and concerns aggregation for computational purposes.

In connection with other operative Code provisions, the consolidated regulations may function in one of three ways: (1) The regulations may apply exclusively by expressly excluding the operation of part or all of a specific Code section;[10] (2) the application of the regulations may be

---

[10] Several of the sec. 1502 regulations contain express exceptions making the regulations exclusive and causing them to preempt statutory or regulatory provisions which may have provided for a different result than the consolidated regulations. See, e.g., sec. 1.1502-3(f)(2)(i), Income Tax Regs. (transfer of sec. 38 property between affiliated group members during a consolidated return year is not treated as a disposition or cessation within the meaning of sec. 47(a)); sec. 1.15027(b), Income Tax Regs. (consolidated tax liability shall be determined under sec. 1.1502-2, Income Tax Regs., without regard to the tax surcharge imposed by sec. 51, the minimum tax imposed by sec. 56, any increase in tax under sec. 47(a), relating to early dispositions of investment credit property, or under sec. 614(c)(4)(C), relating to an election to aggregate certain mineral interests); sec. 1.1502-13(c)(1)(ii)(a), Income Tax Regs. (selling member may not report gain on the installment sales method under sec. 453 to the extent the gain is otherwise deferred by the selling member under the deferred intercompany transaction rules).

subject to the operation of other Code sections;[11] or (3) the regulations may coexist with a Code or regulation provision which is not specifically enumerated in the consolidated regulations. In the context of section 1.1502-4(c), Income Tax Regs., and petitioner's argument, we consider the third variety.

Courts have long held that the power granted to promulgate legislative regulations is insufficient to permit the regulator to invalidate a basic concept of tax law or statute. See *Kanawha Gas & Utilities Co. v. Commissioner*, 214 F.2d 685, 691-692 n.7 (5th Cir. 1954), revg. 19 T.C. 1017 (1953). The power to promulgate consolidated regulations pursuant to section 1502 is the power to conform the applicable income tax law of the Code to the special, myriad problems resulting from the filing of consolidated income tax returns. *American Standard, Inc. v. United States*, 220 Ct. Cl. 411, 602 F.2d 256 (1979). In this vein, section 1.1502-80 of the consolidated regulations provides that "The Code, or other law, shall be applicable to the group to the extent the [consolidated] regulations do not exclude its application."[12]

Here, the regulation could easily be read to be compatible with the literal language of section 902. Section 1.1502-4(c), Income Tax Regs., in pertinent part, contains the following:

(c) *Computation of consolidated foreign tax credit.* The foreign tax credit for the consolidated return year *shall be determined on a consolidated basis* under the principles of sections 901 through 905 and section 960. For example, if the per-country limitation applies to the consolidated return year, *taxes paid or accrued for such year* (including those deemed paid or accrued under sections 902 and 960(a) and paragraph (e) of this section) to each foreign country or possession by the members of the group *shall be aggregated.* If the overall limitation applies, *taxes paid or accrued* for such year (including those deemed paid or accrued) to all foreign countries and possessions by members of the group shall be aggregated.  * * *  [Emphasis supplied by petitioner and respondent.]

We have included petitioner's (italicized) and respondent's (underscored) suggested emphasis in the regulation to

---

[11]See, for example, *infra* note 12, concerning sec. 1.1502-80, Income Tax Regs., where four different Code sections are expressly enumerated in the regulation.

[12]Sec. 1.1502-80, Income Tax Regs., goes on to provide the example that, "in a transaction to which section 381(a) applies, the acquiring corporation will succeed to the tax attributes described in section 381(c)." Secs. 269, 304, and 482 are also specifically enumerated in the regulation as applicable to consolidated groups.

display the language relied upon by each. Actually, both sides have relied upon language in the regulation to make their point. One has combined the operational language with language from the regulation's example and the other has taken language solely from the regulation's example.

The operational language broadly states that "The foreign tax credit for the consolidated return year shall be determined on a consolidated basis under the principles of sections 901 through 905 and section 960." It is not a surprise that the parties looked to the language in the example to make their arguments, because the operational language is broad and ambiguous. The example contained in the regulation more concisely refers to the aggregation of credits for taxes paid or deemed paid by each member. Implicit in the example is the fact that the affiliated members have already qualified for the credits which are, in turn, being aggregated for purposes of computing the consolidated tax liability.

Respondent refers us to section 1.1502-4(j), Examples (1), (2), and (3), Income Tax Regs., which contain examples of computations of foreign tax credits under the various subparts of section 1.1502-4, Income Tax Regs. That example further supports respondent's argument that each affiliated member must first qualify for credits, after which the credits may be aggregated for purposes of overall limitations upon the use of the foreign tax credits.

Petitioner refers us to several peripherally related regulation sections where the affiliated members are treated separately and the separate treatment is more clearly and specifically expressed in the regulatory language. Although section 1.1502-4(c), Income Tax Regs., is broadly stated and not specific, that shortcoming, relative to the more specific language of other sections, does not automatically lead to the conclusion that the general statement should bear the opposite interpretation of that which is specifically expressed. The ambiguity could be interpreted either way and we must decide which way was intended and fits within the statutory and regulatory framework.

Petitioner argues that certain language in section 1.1502-34, Income Tax Regs., supports its position. Respondent, on the other hand, argues that section 1.1502-34, Income Tax

Regs., by specifically referencing various statutory sections and excluding reference to section 902, reflects that petitioner may not aggregate affiliated members' shareholdings in F for purposes of section 902. Section 1.1502-34, Income Tax Regs., in pertinent part, provides:

Special aggregate stock ownership rules.

For purposes of [sections] 1.1502-1 through 1.1502-80, in determining the stock ownership of a member of the group in another corporation (the "issuing corporation") for purposes of determining the application of section 165(g)(3)(A), 332(b)(1), 333(b), 351(a), or 904(f), in a consolidated return year, there shall be included stock owned by all other members of the group in the issuing corporation. * * *

Petitioner relies on the first two lines, suggesting that the regulation is applicable to all of the consolidated regulations or, in the alternative, that the failure to specifically include section 902 as one of the enumerated sections of applicability means that it is free to rely on other approaches and to inject aggregation into section 902. Respondent argues that the exclusion of section 902 and the inclusion of section 904(f) has specific meaning supporting his position. In this regard, respondent points out that section 904(f)(2) already provides that shares owned by all members of the affiliated group will be considered in connection with meeting the 10-percent requirement of that section, whereas section 902 does not so provide. In spite of the aggregation approach set forth in the statute, section 1.1502-34, Income Tax Regs., specifically enumerates 904(f) as a section in which aggregation of ownership may be utilized. Simply, respondent's point, with which we agree, is that it would not have been necessary to list 904(f) and, accordingly, section 902 would have been listed if it was intended that aggregation be applicable.

Petitioner also argues that section 1.1502-34, Income Tax Regs., is not an exclusive listing of sections for which affiliated group members are allowed to aggregate. On this point petitioner refers to a revenue ruling and several private letter rulings[13] wherein aggregation was permitted regarding affiliated members in connection with sections 334(b) and 338. Respondent counters that the revenue ruling

[13]Rev. Rul. 74-441, 1974-2 C.B. 105; LTR 8405070 (Nov. 2, 1983); LTR 8113010 (Dec. 30, 1980); LTR 7952189 (Oct. 1, 1979); LTR 7935067 (May 30, 1979).

and private letter rulings permitted aggregation for section 334(b) purposes because that section incorporated the same stock ownership requirements as section 332(b), which is specifically mentioned in section 1.1502-34, Income Tax Regs. Respondent makes a similar argument concerning section 338 because of his assumption that section 338 was enacted as the successor to repealed section 334(b)(2). The parties seem to be arguing over the concept of whether section 1.1502-34, Income Tax Regs., is exclusive (aggregation is not available unless specifically referenced). We do not think it is necessary, in the context of this case, to decide whether the consolidated regulations section is exclusive.

The fact that respondent permitted aggregation in those situations is neither analogous nor relevant to this case. First, respondent's rulings do not have the effect of law and represent the position of a party (which in this case is not directly relevant to the issue under consideration). Second, private letter rulings are not precedent and have been consulted solely for purposes of considering respondent's administrative practices. Sec. 6110(j)(3); *Rowan Companies, Inc. v. United States,* 452 U.S. 247, 261 n.17 (1981). Essentially, petitioner has shown a few examples of situations where respondent has permitted aggregation even though not specifically mentioned in section 1.1502-34, Income Tax Regs. Petitioner has not shown statutory or case precedent for its position. Proof that others may have obtained favorable rulings concerning aggregation in other areas of the statute is irrelevant to the resolution of this case. Sec. 6110(j)(3). See also *American Association of Christian Schools Voluntary Employees v. United States,* 850 F.2d 1510, 1515 n.6 (11th Cir. 1988).

Petitioner, in a footnote to its brief, also argues that section 1.1502-34, Income Tax Regs., should be invalidated for failure to include section 902 "for no good reason." In this regard, petitioner has not shown, as it must, that these (legislative) regulations are fundamentally at odds or inconsistent with the congressional intent and mandate under the consolidated return provisions. *United States v. Vogel Fertilizer Co.,* 455 U.S. 16, 26 (1982); *United States v. Cartwright,* 411 U.S. 546 (1973).

In the final analysis, it appears that sections 1.1502-4 and 1.1502-34, Income Tax Regs., are not in conflict with each other or with respondent's reading of section 902. They all exist in harmony if section 902 is read and interpreted as not permitting aggregation with respect to the 10-percent requirement. To read it otherwise would be to ignore the literal language of section 902 and stretch and exalt the consolidated regulations beyond their intended reach in this setting. Accordingly, we hold that petitioner is not entitled to aggregate its affiliated members' ownership in order to meet the 10-percent test of section 902.

### Petitioner's Agent or Nominee Position

Having decided that petitioner and its affiliated group are not entitled to aggregate, we next consider petitioner's alternative theory that its affiliates held shares in F as agents and nominees. Petitioner offered this alternative argument, which essentially posits that each subsidiary held the F shares as an agent or nominee of S. Under those circumstances, petitioner contends that it held 10 percent in one shareholder. On this point, the parties' arguments converge upon a recent Supreme Court case which addressed the question of whether the tax attributes of the property held by an agent can be attributed to the principal. *Commissioner v. Bollinger*, 485 U.S. 340 (1988), affg. 807 F.2d 65 (6th Cir. 1986), affg. a Memorandum Opinion of this Court.

For Federal income tax purposes, gain or loss from the sale or use of property is attributable to the owner of the property. *Helvering v. Horst*, 311 U.S. 112, 116-117 (1940). However, under appropriate circumstances, the law may attribute tax consequences of property held by a genuine agent to its principal. *Commissioner v. Bollinger, supra* at 349. The existence of an agency relationship between a parent corporation and its wholly owned subsidiary is not automatically foreclosed by the parent's ownership and control of the subsidiary. *National Carbide Corp. v. Commissioner*, 336 U.S. 422, 437 (1949); *Commissioner v. Bollinger, supra* at 346. Whether a corporation is a true agent of an owner-principal is determined by reference to four indicia

and two requirements. *Commissioner v. Bollinger, supra* at 346; *National Carbide Corp. v. Commissioner, supra.*

The four indicia of agency status are as follows: (1) Whether the corporation operates in the name and for the account of the principal; (2) whether the corporation binds the principal by its actions; (3) whether the corporation transmits money received to the principal; and (4) whether receipt of income is attributable to the services of employees of the principal and to assets belonging to the principal. *Commissioner v. Bollinger, supra* at 347; *National Carbide Corp. v. Commissioner, supra* at 437.

Although a subsidiary corporation satisfying these indicia may be considered a true agent of its parent in a general sense, two other requirements are also imposed. The first requirement mandates that the subsidiary's agency relationship with its parent cannot be derived exclusively from the fact that it is owned by its parent-principal. This factor addresses the separate-entity doctrine expressed in *Moline Properties v. Commissioner*, 319 U.S. 436 (1943). It demands proof positive that the agency relationship exists separate and apart from the subsidiary's ownership by its principal and that it is not in substance a tax-avoiding manipulation of an otherwise independent legal entity. See *National Carbide Corp. v. Commissioner, supra* at 437-438; *Moline Properties v. Commissioner, supra* at 440. These concerns are satisfied where unequivocal evidence of the genuineness of the agency relationship exists. *Commissioner v. Bollinger, supra.*

Assuming unequivocal evidence of a genuine agency relationship is present, it must lastly be established that the subsidiary's business purpose was the carrying on of the normal duties of an agent. Reference to general agency principles will determine whether this second requirement is satisfied. *Commissioner v. Bollinger, supra* at 347.

Because of the emphasis and importance placed on *Bollinger*, a closer inspection is appropriate. Mr. Bollinger was a Kentucky real estate developer who used corporations formed solely for the purpose of acting as agent to avoid State usury laws[14] for financing purposes. Lenders were

---

[14]The Kentucky statutes prohibited interest in excess of 7 percent, but the prohibition did not apply to corporations. See Ky. Rev. Stat. secs. 360.010, 360.025 (1972).

willing to finance at 8 percent and required the use of a corporate nominee in order to steer clear of the State usury statute. Mr. Bollinger entered into written agreements with the corporations he formed providing that the corporations would hold legal title to the realty solely for the purpose of securing financing, that the corporations were to act as agents, and that Mr. Bollinger would indemnify and hold the corporations harmless for any liability that they might sustain as agents and nominees. The parties to the transactions were aware that the corporation had been interposed as agent and/or nominee solely for purposes of avoiding usury prohibitions.

In deciding that Mr. Bollinger was the taxpayer, the Supreme Court expressed its concern for preservation of the principle and practice of respecting a separate corporate existence, even concerning transactions between a corporation and its sole shareholder, as set forth in *Moline Properties v. Commissioner, supra.*

To fit within this framework, petitioner first argues that its sole purpose for spreading the ownership of F shares amongst several affiliates, rather than having one shareholder, was to obtain a voting benefit under article 16 of the articles of association of F prohibiting any shareholder, regardless of the number of shares held, more than six votes. Petitioner advances the obvious and convincing business purpose that they wished to protect a sizeable investment in F by exercising their shareholders' rights to cause the election of officers and board members in order to participate in management. Respondent agrees that this was a valid business purpose of petitioner, but points out that certain of the affiliates also obtained business benefits from ownership of F shares. The "Edge Act subsidiaries," for example, were required to maintain capital of at least $2 million and the F shares were counted in the satisfaction of that requirement. Nevertheless, we find that the principal business purpose[15] of placing ownership of F shares in subsidiaries was to maintain and possibly enhance control

[15]There is no particular requirement that there be a business purpose. We have made this finding to distinguish this situation from one where the transfer of ownership was motivated solely or primarily for purposes of tax benefit. Here petitioner was not seeking some double benefit and was not involved in any type of scheme or device concerning the reporting of its tax liability.

over the investment in F. Having found, in the same vein as *Bollinger,* that the property was held in a manner which reflects that it could have been the subject of an agency (or nominee) relationship, we proceed to see if an agency relationship existed, and if it did whether it meets the test of *National Carbide,* as applied in *Bollinger.*

The parties' initial controversy[16] over the "six *National Carbide* factors"[17] concerns the requirement of whether the corporation's relations with its principal are not dependent upon the fact that it is owned by the principal. Although petitioner acknowledges that the *Bollinger* court set out the six *National Carbide* factors, it argues that the Supreme Court ruled for the taxpayer without deciding whether the fifth one had been met and without holding the taxpayer to a strict or literal compliance with some or all of the remaining "factors." Respondent argues that the Supreme Court did not eliminate or ignore the fifth factor[18] or decide that a wholly owned subsidiary could be an agent for its owner.

After noting that the relationship between a corporation-agent and its owner-principal is always based on ownership and the owner can cause the relationship to be altered or terminated at any time, the Supreme Court stated that this requirement (the fifth factor) was an attempt to protect the separate-entity doctrine of *Moline.* The Supreme Court's decision and rationale in *Bollinger* is an attempt at balancing a concern for the viability of the concept in *Moline* with situations where tax consequences should flow through a corporation which is acting as a "genuine agent." In that connection, the Court expressed the view that it agreed "that it is reasonable for the Commissioner to demand unequivocal evidence of genuineness [of the agency relation-

---

[16]Petitioner first argues that the affiliates acquired their F shares for a "legally [under Dutch law] invalid 'cause' " because it was acquired to avoid the voting rights limitations of F's articles of association. Under this theory, petitioner argues that the affiliates received bare legal title and did not beneficially own the F stock. Petitioner then advises that we need not disregard the affiliates' ownership, because they acted as agents for S. At that point in its argument, petitioner shifts to a discussion of *Commissioner v. Bollinger,* 485 U.S. 340 (1988), affg. 807 F.2d 65 (6th Cir. 1986), affg. a Memorandum Opinion of this Court.

[17]Although the parties use the term "factor" for all six items set forth in *National Carbide Corp. v. Commissioner,* 336 U.S. 422, 437 (1949), actually the first four appear to be indicia and the last two (numbers 5 and 6) appear to be requirements.

[18]Respondent also argues that, unlike the relationship in *Commissioner v. Bollinger, supra,* the facts in this case fall short of meeting most of the requirements of the six *National Carbide* factors. Each of the factors is discussed separately.

ship] in the corporation-shareholder context, in order to prevent evasion of *Moline*." 485 U.S. at 349. The essence of this analysis is that petitioner must show the genuineness of the agency relationship, separate and apart from its general authority to control the corporate subsidiaries.

The facts in our record do contain numerous circumstantial bits of evidence which could be interpreted to imply the existence of an agency relationship between S and its affiliates. But there is no direct and/or explicit evidence that an agency relationship existed in the manner that the facts and principles of *Bollinger* appear to require. As pointed out by the Supreme Court, the element of control is always present between a corporation and its owner. That control is similar to the type of control found in an agency relationship. Accordingly, petitioner must decisively show that a "genuine agency" was intended to ensure the viability of the *Moline* doctrine. Petitioner has failed to show such a relationship existed between S and its affiliates during the years under consideration. Because we do not factually find the existence of an agency relationship in this case, we do not need to address respondent's contention that, as a matter of law or precedent, *Bollinger* stands for the proposition that a wholly owned subsidiary cannot be an agent for its owner.[19]

Looking at the first indicia, we consider whether the corporation operated in the name and for the account of the principal. In the setting of this case, S was obviously the moving and active party in the overall relationship with F. Additionally, certain references in correspondence between regulatory agencies and. F imply that S was the owner or possibly the principal owner of the shares and/or interests in F. In connection with these facts and regarding petitioner's argument that the shares were dispersed for voting purposes only, respondent argues that each affiliate was record owner of the shares and had acquired ownership by purchase or capital contribution. On this particular point, we agree with petitioner that, in essence, it appears that S was the party in interest with respect to the F relationship

---

[19]Our declining to discuss this point is not intended to connote that there is any question in our mind, one way or the other, about whether such an agency relationship could legally exist. We merely exercise judicial discretion in this instance to avoid unnecessary dicta.

and that ownership of the shares was dispersed to affiliates solely for improving the group's voting capacity. Accordingly, the first indicia supports petitioner's position.

The second indicia concerns whether the corporation binds the principal by its actions. On this point petitioner simply argues "the votes cast by the affiliates' representatives were binding on [S]." There is no question in this case regarding the binding nature of the votes of each shareholder. Accordingly, if an agency relationship existed concerning the F shares, then the second indicia would be satisfied.

The third indicia involves whether the corporation-agent remits money or income received in connection with the principal's alleged property. Petitioner argues that this factor is irrelevant. On that point we agree that no particular factor should be considered determinative and that the factors individually are not conclusive. On the other hand, all of the factors considered together and in conjunction with the particular facts of each case will be determinative. Depending upon the circumstances of each case, emphasis may be placed on different factors. Here, we feel that the third indicia is relevant. If the affiliates were acting as agents, they would have turned over the dividends or benefits of the ownership to the principal. Petitioner points out that such was unnecessary because the affiliates filed a consolidated return and the net tax effect was the same. That, however, begs the question because we have already decided that the consolidation for tax purposes does not, as a matter of law, cause the aggregation of ownership of F shares. As to this indicia, we agree with respondent that it tends to support his position.

The fourth indicia concerns whether receipt of income is attributable to the services of the principal and to assets belonging to the principal. Regarding this indicia, the record in this case supports both petitioner's and respondent's position. Clearly, S's employees managed the affiliated group's investment in F. S's officer was designated to sit on the board and vote the shares of all affiliated shareholders. In terms of the assets, it is equally clear that each affiliate separately owned its shares which were purchased or

acquired by means of its assets or a contribution to its capital.

Finally, the sixth factor is a requirement that the corporation's business purpose must be the carrying on of the normal duties of an agent. On this point petitioner argues that it was intended that each affiliate would hold shares in F to maximize the voting rights in F. Implicit in petitioner's argument is that the affiliates acted as agents or nominees. Respondent agrees that it was intended that the affiliates would own shares to enhance voting capability, but that the affiliates did not hold shares as agents of S. Instead, respondent argues, each affiliate was an "ongoing corporation with its own business," so that it was not its business purpose to act as agent for S. We agree with respondent on this point.

As pointed out above, there are several factors and facts in this record which indicate that the affiliated corporations involved were acting in concert and on behalf of affiliated members. It is most significant that this type of action is usual in consolidated groups with common ownership.[20] As pointed out in *Bollinger,* the inherent commonality in such relationships requires the showing of a genuine agency relationship in order to protect the *Moline* theory of separate corporate existence. We find in this case that petitioner has not shown an agency relationship (an agency in fact) existed in this case.

Finally, we appreciate petitioner's argument that it is logical that aggregation be permitted for a consolidated group, but note that permitting such aggregation is solely within the province of Congress. Additionally, petitioner could have placed all shares of F in one corporation and relied upon the agreements with F regarding the election of board members. Petitioner, however, spread ownership amongst affiliates and risked the possibility of losing the credit provided for in section 902.

The parties devote the remainder of their legal arguments to a discussion of whether the 10-percent voting stock requirement of section 902(a) refers to 10 percent of total

---

[20]Petitioner's reference to sec. 1.1502-77, Income Tax Regs., which permits an agency relationship for purposes of election under sec. 936(e) on behalf of the consolidated group, further illustrates this principle. See also *Insilco Corp. v. Commissioner,* 73 T.C. 589, 595 (1979), affd. without published opinion 659 F.2d 1059 (2d Cir. 1981).

shares or 10 percent of the voting power. Because we do not find that the requisite 10 percent is present in either event, it is unnecessary to consider this point.

To reflect the foregoing,

*Decision will be entered under Rule 155.*