T.C. Memo. 2011-101

UNITED STATES TAX COURT

F. JEFFREY RAHALL, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 6028-06, 21710-07.    Filed May 16, 2011.

F. Jeffrey Rahall, pro se.

<u>Michael D. Zima</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

COHEN, <u>Judge</u>:  Respondent determined deficiencies, penalties, and additions to tax as follows:

<u>Docket No. 6028-06</u>

| Year | Deficiency | Penalty Sec. 6663 |
|------|------------|-------------------|
| 1999 | $343,344 | $257,508.00 |
| 2000 | 965,278 | 723,958.50 |

Docket No. 21710-07

| Year | Deficiency | Penalty Sec. 6663 | Addition to Tax Sec. 6651(a)(1) |
|------|-----------|-------------------|--------------------------------|
| 2001 | $986,869 | $740,151.75 | $246,717.25 |
| 2002 | 1,280,782 | 960,586.50 | 320,195.50 |
| 2003 | 1,013,949 | 760,461.75 | --- |

After concessions, the issues for decision are: (1) Whether petitioner is liable for tax on amounts he received from two domestic trusts; (2) whether petitioner is liable for tax on capital gain from a domestic trust; (3) whether petitioner is liable for tax on amounts he received from two foreign trusts; (4) whether petitioner is liable for tax on credit card payments of his personal expenses by a foreign trust; (5) whether petitioner is liable for tax on unexplained deposits made into his accounts; (6) whether petitioner is entitled to deduct capital losses relating to two alleged business ventures; (7) whether petitioner is entitled to a deduction for a theft loss; (8) whether petitioner is liable for an addition to tax under section 6651(a)(1) for years 2001-03; (9) whether petitioner is liable for the fraud penalty under section 6663 for all years in issue. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference. At all material times, petitioner resided in Florida.

Petitioner is the only son of Farris E. Rahall and Victoria B. Rahall. After graduating from college, petitioner was employed as a stockbroker. Petitioner married Cary B. Rahall in 1982, and they have three children. Petitioner's parents accumulated millions of dollars throughout their lives, mostly through the operation and sales of several television and radio stations. As a result, petitioner's father established a number of trusts to hold his family's wealth, much of it for the benefit of petitioner and his children.

The trust instrument for the "Farris E. Rahall Trust" (1964 Trust), an irrevocable trust, was executed November 2, 1964, in Pennsylvania. Petitioner's father was the settlor, and N. Joe Rahall and Sam G. Rahall (petitioner's uncles) were the initial trustees. Petitioner's mother was subsequently added as a trustee. Section II(a) of the trust instrument states:

> Trustees may withhold a portion or all of net income subject to the childrens' needs for living or education or investments in businesses in which they may participate in management. Trustees may distribute any portion of net income or principal to Settlor's wife or children on an annual or quarterly basis.

Thus, the trust could accumulate income or distribute all income or any of the corpus as the trustees deemed necessary.

The trust instrument for the "Farris Jeffrey Rahall 1978 Trust" (1978 Trust) was executed October 14, 1978, and established a revocable trust under Florida law. An amendment executed December 14, 1995, named petitioner as the grantor and one of the trustees. Petitioner was the only beneficiary during his lifetime. An amendment executed December 20, 2001, made petitioner the sole trustee. Article III of the 1995 amendment states:

> During the lifetime of the Grantor, the Trustees shall pay to, or apply in behalf of, the Grantor such portion of the net income and/or principal of the trust and at such time or times as shall be required, in the sole and sound discretion of the Trustees, to allow the Grantor to be properly supported and maintained and to enable the Grantor to meet all medical expenses and emergency or untoward circumstances during the Grantor's lifetime. Notwithstanding the foregoing, the Trustees shall pay or apply so much of the net income and/or principal of the trust to the Grantor or to such person or persons as the Grantor may from time to time direct for any purpose whatsoever.

Thus, petitioner could direct the trustees to pay any amount of income or trust corpus he desired.

The Declaration of Trust for Tee Holdings, Ltd. (Tee Holdings), purported to establish an irrevocable trust under Cayman Islands law on June 26, 1991. The Cayman Overseas Trust Co. was the original trustee and had the "absolute discretion" to distribute or accumulate income for the benefit of the

beneficiaries. Petitioner was a beneficiary throughout the years in issue. The corpus was to be distributed to living beneficiaries upon termination of the trust. Tee Holdings was later renamed South West Coast Holdings at the request of petitioner. (For simplicity, all references will be to Tee Holdings.)

The Wheels Trust was established in 1995 under Channel Islands law. The donor, the Wheels Foundation, transferred property into the trust, and the assets were held in the Channel Islands. Petitioner controlled the Wheels Trust bank accounts throughout the years in issue.

Petitioner's parents' health deteriorated significantly over the years prior to 2000. In 2000, petitioner obtained powers of attorney with respect to the financial affairs of his parents. Using these powers of attorney, he was able to transfer funds among their accounts and his own. Between 1999 and 2003, petitioner requested and received distributions from each of the above-named trusts and from many other sources in at least the following amounts: $335,315 in 1999, $1,079,668 in 2000, $2,303,755 in 2001, $3,232,837 in 2002, and $2,682,117 in 2003.

In addition to what he received from the various trusts, petitioner incurred numerous charges on a Cayman National Bank credit card. The credit card charges were paid by Tee Holdings.

The total charges the trust paid on petitioner's credit card were as follows:

| Year | Total Payments |
|------|----------------|
| 1999 | $403,551.00 |
| 2000 | 657,000.00 |
| 2001 | 164,500.00 |
| 2002 | 60,212.00 |
| 2003 | 30,217.50 |

Disputed Deductions and Losses

In 1998, petitioner met Brooks Rose (Rose) when he hired her as an escort.  They subsequently developed a personal relationship.  Throughout the years in issue, petitioner transferred hundreds of thousands of dollars to Rose and paid many of her expenses, including travel expenses, school tuition for her children, vehicles, and medical expenses.

In addition to their personal relationship, from 1999 through 2002 petitioner engaged in various purported business and charitable activities with Rose under the purported corporations "Angels for Angels" and/or "Angel Quest".  (It is unclear from the record whether Angel Quest and Angels for Angels existed as entities or were entirely fictitious or in any event to which one petitioner transferred money.)  With his 2002 Form 1040, U.S. Individual Income Tax Return, petitioner included a list of expenditures on two credit cards, indicating the charges related to Angel Quest.  These expenses totaled $61,470 in 1999, $290,726 in 2000, and $40,248 in 2001.  Most of these expenses were

charges made for travel and at restaurants around the world, including $10,177.01 at the Ritz Carlton in Cancun over several days in 1999 and $9,366.36 at hotels in Tahiti in 2000. Petitioner deducted $392,444 in theft losses for these expenditures on his belatedly filed 2002 income tax return, discussed below.

Petitioner also purchased numerous items for Rose. In 2000, petitioner purchased property in Boca Raton, Florida, for Rose to live in with her family. The property was purchased in the name of Angel Heaven, Inc. (Angel Heaven), a corporation petitioner formed for the sole purpose of holding title to the property.

Petitioner also gave Rose money for "Attitude Hair Salon" (Attitude), a purported business Rose and her friend David Giordano (Giordano) developed in 2001. With respect to Attitude, petitioner made thousands of dollars in wire transfers to Rose and indicated on the documentation included with his 2002 tax return charges to his credit cards, mostly for meals and travel expenses. Petitioner deducted a long-term capital loss of $246,354 for worthless stock with respect to his contributions to Attitude on his 2002 tax return.

In 2003, petitioner engaged in another real estate transaction for the benefit of another personal female friend. Under the name of Oak Hill Stables, Inc., petitioner purchased property in Ocala, Florida, where this friend lived with her

daughter.  In addition, petitioner purchased a horse trailer for use at the property.  The trailer was titled in petitioner's mother's name.

On his 2000 tax return, petitioner deducted $100,000 as a capital loss relating to Webtank, Inc. (Webtank).  At some point, petitioner paid Webtank $18,000 for a Web site Webtank had created at his request.

During all years in issue, petitioner owned all of the outstanding stock of FJR Investments, Inc. (FJR Investments), an S corporation.  During this time the company did not conduct any identifiable business activity and did not have any employees. Expenses charged to the FJR Investments accounts include satellite television for petitioner's residence, automobile insurance for his family's personal vehicles, yacht club membership fees, travel expenses, magazine subscriptions, and diamonds for Rose.  The total amounts of these items were:

| Year | Amount |
|------|--------|
| 1999 | $41,960 |
| 2000 | 75,581 |
| 2001 | 28,518 |
| 2002 | 29,224 |
| 2003 | 9,385 |

Petitioner deducted those amounts on his tax returns as business expenses.

During all years in issue, petitioner deducted large amounts of medical expenses.  The returns for the years in issue included

on Schedule A, Itemized Deductions, the following medical
expenses:

| Year | Amount |
|------|--------|
| 1999 | $77,846 |
| 2000 | 101,062 |
| 2001 | 112,613 |
| 2002 | 32,330 |
| 2003 | 37,974 |

IRS Examination

In 2002, the Internal Revenue Service (IRS) began an audit
of petitioner's tax returns for 1999 and 2000.  The audit was
precipitated by petitioner's use of the Cayman National Bank
credit card, paid using funds from Tee Holdings.

During the audit with respect to 1999 and 2000, the IRS
requested numerous documents from petitioner regarding the
foreign trusts, the domestic trusts, and petitioner's personal
finances.  Among other things, petitioner denied knowledge of the
Wheels Trust.  As the audit progressed, petitioner's personal
assistant gathered the relevant documents together into 13 boxes.
Petitioner hired Gray Gibbs (Gibbs), an attorney who had worked
for petitioner and his father, to represent him during the audit.
The 13 boxes of records were delivered to Gibbs' office, but only
some of the documents from those boxes were ever provided to the
IRS.

The documents that petitioner supplied included limited
financial statements from the trusts, canceled checks from his

personal accounts and the FJR Investments account, and credit card statements from the Cayman National Bank card. Also among the documents was a letter dated February 11, 1999, to petitioner's father from Deutsche Bank Offshore DMG Trust (Deutsche Bank), the bank that held the Wheels Trust account. The letter included a handwritten note from petitioner's father to petitioner requesting his advice about a change the bank was making with respect to the Wheels Trust.

Cary B. Rahall, who was estranged from petitioner at the time of the audit, hired separate counsel to represent her in relation to the audit. She cooperated with the examining agents and provided some relevant documentation that she obtained from petitioner's residence. These documents included correspondence dated July 10, 2001, from petitioner to Deutsche Bank seeking a distribution from the Wheels Trust. The IRS granted Cary B. Rahall innocent spouse relief.

While the audit was continuing, the IRS began a program called the Offshore Voluntary Compliance Initiative, also known as the Last Chance Compliance Initiative (LCCI) for taxpayers that had used offshore payment cards (including credit, debit, or charge cards) or offshore financial arrangements to avoid U.S. income tax. See Rev. Proc. 2003-11, 2003-1 C.B. 311. The program offered to limit imposition of the civil fraud and Foreign Bank and Financial Accounts penalties against a taxpayer

on condition that the taxpayer provide documentation requested by the IRS.  That documentation included, but was not limited to: Copies of previously filed returns (on which reported tax due must have been fully paid); descriptions of offshore payment cards and accounts; descriptions of the sources of foreign income; and complete and accurate amended or delinquent original Federal tax returns with full payment of taxes due for all years in issue (regardless of whether related to offshore accounts).

On November 24, 2003, the IRS sent petitioner a letter offering him the opportunity to participate in the LCCI program. In order to participate, he was required to provide the requested information about his foreign accounts.  The IRS also expanded the audit to include the years 2001-03, for which petitioner had not yet filed returns.  Although the terms of the LCCI offer required that he supply requested documents within 150 days, petitioner did not provide the requested information.

Participation in the LCCI also required petitioner to submit amended tax returns to address the deficiencies the IRS had determined for all years in issue.  Ultimately the IRS determined that the amended returns for 1999-2000 and the tax returns petitioner eventually filed for 2001-03 on July 7, 2004, raised many of the same concerns his original returns for 1999 and 2000 had raised.  He continued to deduct business expenses arising from his use of the FJR Investments account, deduct thousands of

dollars in medical expenses he could not substantiate, and substantially underreport his income. He did not provide any documentation to substantiate the original corpus or income of the trusts or the theft or capital losses he deducted in 2002. He did not explain deposits to his accounts of $43,400 in 1999, $516,580 in 2001, $759,349 in 2002, and $914,412 in 2003 uncovered by the IRS during the course of the audits. Petitioner identified the source of a $4,752 deposit and a $19,237 deposit, both made in 2002, as Fidelity Brokerage Services (Fidelity) and "Rahall Realty", respectively, but he did not identify the reason for those deposits.

On July 14, 2004, the IRS sent petitioner a second letter outlining the remaining documents he was required to submit to comply with the offer. On November 2, 2005, the IRS determined that petitioner had not complied with the terms of the LCCI and withdrew the offer.

OPINION

Prior to trial, the parties made a number of concessions. Petitioner conceded that his medical expenses should be reduced by $58,712, $49,491, $96,745, $18,346, and $28,720 for 1999-2003 respectively, the amounts he was unable to substantiate. Furthermore, in 2003 he is not entitled to a short-term capital loss and is subject to a 10-percent penalty under section 72(t)

on a distribution he received from a qualified plan.  Petitioner also conceded that the deductions claimed for supposed business expenses with respect to FJR Investments were improper. Respondent conceded that petitioner's parents, not petitioner, are taxable on the income of the foreign trusts in 1999 and 2000. Respondent has also conceded that petitioner is not taxable on a capital gain adjustment for 1999 or $858,945 of an adjustment determined for 2000 in the notice of deficiency for those years.

Deposits to Petitioner's Accounts

A taxpayer is required to maintain adequate books and records sufficient to establish his or her income.  See sec. 6001; DiLeo v. Commissioner, 96 T.C. 858, 867 (1991), affd. 959 F.2d 16 (2d Cir. 1992).  When a taxpayer fails to maintain these records, the Commissioner may determine income under the bank deposits method.  Id.  A bank deposit is prima facie evidence of income.  Id. at 868; Tokarski v. Commissioner, 87 T.C. 74, 77 (1986).  Once respondent has made this prima facie case, petitioner bears the burden of showing that the deposits made into his account represent nontaxable income.  See DiLeo v. Commissioner, supra at 868.  As to income and deduction items, petitioner must present credible evidence to shift the burden to respondent under section 7491(a).  He has not done so.

Of the deposits to petitioner's accounts the IRS uncovered during the audit, the following remain in issue for 1999:

| Source | Amount |
| --- | --- |
| 1964 Trust | $19,650 |
| 1978 Trust | 107,050 |
| Unknown sources | 43,400 |

The following deposits remain in issue for 2000:

| Source | Amount |
| --- | --- |
| 1978 Trust | $99,970 |
| Tee Holdings | 590,000 |

The following deposits remain in issue for 2001:

| Source | Amount |
| --- | --- |
| 1964 Trust | $449,000 |
| Tee Holdings | 560,000 |
| Fidelity | 8,000 |
| Cash | 16,800 |
| Unknown sources | 516,580 |

The following deposits remain in issue for 2002:

| Source | Amount |
| --- | --- |
| 1964 Trust | $105,000 |
| 1978 Trust | 52,315 |
| Wheels Trust | 444,914 |
| Fidelity Brokerage Services | 4,752 |
| Rahall Realty | 19,237 |
| Cash | 3,700 |
| Unknown sources | 731,660 |

The following deposits remain in issue for 2003:

| Source | Amount |
| --- | --- |
| 1964 Trust | $151,500 |
| 1978 Trust | 95,475 |
| Tee Holdings | 449,144 |
| Wheels Trust | 513,262 |
| Unknown sources | 914,412 |

Domestic Trusts

The definition of gross income under section 61(a) broadly encompasses any accession to a taxpayer's wealth.  Commissioner v. Schleier, 515 U.S. 323, 327-328 (1995).  Gross income specifically includes "Income from an interest in an estate or trust."  Sec. 61(a)(15).

1964 Trust

Section 662 governs the tax obligations of trust beneficiaries as to distributions from trusts which may accumulate income or distribute corpus.  Beneficiaries are required to include in income any amounts the trust is required to distribute currently and any other distributions to the extent they represent income earned by the trust; to the extent those distributions represent corpus, the beneficiary does not need to include the amount in income.  Sec. 662(a).

Because the 1964 Trust can accumulate income and distribute corpus, its beneficiaries are taxed according to section 662.  Therefore, to the extent that the amounts petitioner received represented trust income, he must include them in his taxable income.  Petitioner has failed to provide supporting documentation that would distinguish between corpus and income and has failed to meet his burden of proving that he received amounts representing trust principal rather than income.  He must

therefore include the entire amounts in income for the years 1999, 2001, 2002, and 2003.

### 1978 Trust

Respondent argues that the 1978 Trust is a grantor trust that meets the requirements of sections 671-679 and is to be disregarded as a separate taxable entity to the extent of the grantor's retained interest. See sec. 1.671-2(b), Income Tax Regs. Respondent contends that petitioner, as a grantor of a grantor trust, must therefore report his portion of the trust's income and deductions on his own tax return.

For purposes of the grantor trust provisions, a grantor includes any person to the extent that person either creates a trust or gratuitously transfers property, directly or indirectly, to a trust. Sec. 1.671-2(e)(1), Income Tax Regs. If one person creates or funds a trust on behalf of another person, both persons are treated as grantors of the trust. Id. The trust instrument, as amended, indicates that petitioner is the grantor of the 1978 Trust.

The grantor of the trust is taxed on the income of the trust under the grantor trust provisions if any of certain conditions apply. First, the grantor possesses a disqualifying reversionary interest. Sec. 673. Second, the trust can be revoked by the grantor or a nonadverse party. Sec. 676. Third, trust income can be distributed to the grantor or the grantor's spouse or be

used to pay for insurance on their lives without the consent of an adverse party. Sec. 677. Fourth, specified powers to control beneficial enjoyment of the corpus or income are vested in the grantor or certain other persons. Sec. 674. Fifth, certain administrative powers are exercisable by the grantor or a nonadverse party. Sec. 675.

Petitioner had full control over the 1978 Trust as indicated by the trust instrument. None of the other trustees nor any other party could limit the distribution of either principal or income to petitioner. Furthermore, petitioner ultimately became the only trustee after a 1995 modification of the trust instrument. The trust is therefore disregarded as an entity for tax purposes, and trust income is attributable to petitioner.

Petitioner has taxable income to the extent that the amounts he received were attributable to income the trust earned, rather than the corpus of the trust. Petitioner again bears the burden of proving that the payments he received were not taxable income. He has not provided evidence that would distinguish income from corpus, and he is liable for tax on all amounts he received in the years 1999, 2000, 2002, and 2003.

Because petitioner is liable for tax on the income of this trust, he is also liable for tax on net capital gain of $32,204, which he included on the amended return for 2000 he submitted during the audit.

Foreign Trusts

Tee Holdings

Because Tee Holdings, like the 1964 Trust, may distribute income or corpus at the trustee's discretion, distributions are taxable according to section 662.  Respondent also contends that because petitioner failed to provide documentation as to the character of the distributions, they are taxable to petitioner. Section 6048(c)(2)(A) provides:  "If adequate records are not provided to the Secretary to determine the proper treatment of any distribution from a foreign trust, such distribution shall be treated as an accumulation distribution includible in the gross income of the distributee".

Petitioner has not provided evidence that would prove whether the amounts he received exceeded the income the trust earned.  He could not demonstrate what capital was placed into the trust or the extent of the income earned and retained. Without this evidence, petitioner is liable for tax on his receipts from Tee Holdings in 1999, 2000, 2001, and 2003.

Additionally, Tee Holdings paid the Cayman National Bank credit card charges that petitioner incurred.  These indirect payments are taxable to petitioner for the same reasons the direct payments were taxable to him.  See Traylor v. Commissioner, T.C. Memo. 1990-132, affd. without published opinion 959 F.2d 970 (11th Cir. 1992).

### Wheels Trust

Similarly, petitioner has not provided evidence regarding the Wheels Trust sufficient for us to classify amounts he received as income or principal. The documents petitioner provided are incomplete; they do not provide sufficient detail to determine all of the income the trust earned and therefore do not meet the requirements of section 6048. The amounts petitioner received from the Wheels Trust in 2002 and 2003, including amounts deposited into a joint account with his wife, are taxable to him.

### Unexplained Deposits

Respondent argues that because petitioner is unable to demonstrate that several deposits made into his personal accounts are nontaxable, he is liable for tax on those amounts. Respondent has made a prima facie case using the bank deposits method with respect to deposits from two specific sources-- Fidelity and Rahall Realty--and other deposits from entirely unknown sources.

#### Fidelity

Petitioner has not demonstrated that the $4,752 deposit made to his account in 2002 from Fidelity is nontaxable. Fidelity held at least one of the trusts from which petitioner received taxable income. He has not met his burden with respect to the deposit from Fidelity and is liable for tax on that amount.

Rahall Realty

Petitioner deposited $19,237 from Rahall Realty in 2002.  He has provided no evidence as to the nature of this entity or the purpose of the payment.  Petitioner has likewise not met his burden with respect to this deposit.

Unknown Sources

Additional deposits were made to petitioner's accounts in cash or from entirely unknown sources in 1999, 2001, 2002, and 2003.  Petitioner presented no evidence as to who made these deposits or why they were made and therefore has not met his burden of proof for those deposits.

Capital Losses

Webtank

Petitioner has failed to demonstrate that he is entitled to the $100,000 capital loss deduction relating to Webtank.  He has provided what he represents to be a stock certificate, which reflects only ownership in Webtank by another trust, and evidence that Tee Holdings, not petitioner, also holds an interest in Webtank.  The only evidence of invested funds was a canceled check to Webtank from FJR Investments for $18,000, which petitioner admits was payment for a Web site that he hired Webtank to produce.  None of this documentation shows that petitioner owned stock in Webtank and had a basis of $100,000, or any amount, for capital loss purposes.  Thus, petitioner has not

demonstrated that he is entitled to the $100,000 capital loss he deducted for 2000.

### Attitude

Petitioner deducted a long-term capital loss of $246,354 for his purported investment in Attitude in 2002, and he claimed a capital loss carryover of $202,892 in 2003. He bases his claimed loss on credit card charges by hotels and restaurants, but he has failed to substantiate the business purpose of the expenses as required by section 274(d). Petitioner claims that the purpose of the travel reflected in the charges was for Rose and Giordano "to be traveling the country doing hair extensions". Petitioner's testimony suggested that Rose made little effort to start or operate the alleged business and that the expenses were paid as a result of petitioner's personal relationship with Rose. Petitioner has not met his burden and may not deduct any capital loss with respect to Attitude.

## Theft Loss Deduction

Respondent disallowed petitioner's 2002 itemized deduction for a theft loss related to his alleged charitable contributions to Angel Quest. In order to sustain a theft loss deduction, a taxpayer has the burden of proving that he discovered a loss in the taxable year in issue as a result of a theft, as defined by the law of the jurisdiction in which the claimed loss took place, and the amount of the loss. Axelrod v. Commissioner, 56 T.C.

248, 256 (1971); <u>Monteleone v. Commissioner</u>, 34 T.C. 688, 692 (1960). A taxpayer must also prove that he was the owner of the property stolen. <u>Draper v. Commissioner</u>, 15 T.C. 135, 135-136 (1950); see <u>Kim v. Commissioner</u>, T.C. Memo. 1995-598.

Petitioner claims that Rose tricked him into providing money to Angel Quest, which she apparently claimed to be a charitable organization. He asserts that he believed Angel Quest was developing a calendar using photographs of models posed in exotic locations, and the profits from the calendar and any other ventures the organization undertook would be given to charity. Neither petitioner nor Rose had any experience in creating this type of calendar, but petitioner argues that he paid large sums of money to allow himself, Rose, her children, and others to produce a calendar. No calendar was ever created, and petitioner produced only a handful of pictures which he contends were taken through this operation.

The expenses charged to petitioner's credit card in relation to Angel Quest are almost exclusively for food and beverages, travel expenses, and hotel charges. The travel was generally to vacation destinations for himself, Rose, her children, and occasionally others. Given this context, his claim that he believed these expenses were legitimate costs of a charity is implausible. Furthermore, petitioner offered no proof that he actually paid the expenses he charged to the credit card. In any

event, we are not persuaded that the payments and purchases he made for Rose, a person with whom he admittedly had a personal relationship, were stolen from him. Petitioner has failed to meet his burden of demonstrating that he is entitled to a theft loss deduction in 2002.

Section 6651(a)(1) Addition to Tax

Section 6651(a)(1) provides that in the case of failure to file a tax return on the date prescribed for filing (including any extension of time for filing), there shall be added to the tax required to be shown on the return an amount equal to 5 percent of that tax for each month or fraction thereof that the failure to file continues, not exceeding 25 percent in the aggregate, unless it is shown that the failure to file timely is due to reasonable cause and not due to willful neglect. A taxpayer has the burden of proving that the failure to timely file was due to reasonable cause and not to willful neglect. See Higbee v. Commissioner, 116 T.C. 438, 446 (2001). Under section 7491(c), respondent has the burden of production and met his burden when the parties stipulated that the returns for 2001 and 2002 were filed late, both on July 7, 2004.

Petitioner has not demonstrated reasonable cause for filing late returns. See sec. 301.6651-1(c), Proced. & Admin. Regs. Petitioner's only justification for late filing was that issues regarding income from the foreign trusts arose during an ongoing

audit and he was unable to file his returns until those issues were resolved.  The ongoing audits or other actions before the IRS, even when the issues raised for those prior years are similar to an issue raised for the year in issue, do not provide petitioner with reasonable cause.  See Owens v. Commissioner, T.C. Memo. 2001-143; Likes v. Commissioner, T.C. Memo. 1991-286. Petitioner is liable for the addition to tax under section 6651(a)(1) for 2001 and 2002.

Section 6663 Fraud Penalty

The penalty in the case of fraud is a civil sanction provided primarily as a safeguard for the protection of the revenue and to reimburse the Government for the heavy expense of investigation and the loss resulting from the taxpayer's fraud. Helvering v. Mitchell, 303 U.S. 391, 401 (1938); Sadler v. Commissioner, 113 T.C. 99, 102 (1999).  The Commissioner has the burden of proving, by clear and convincing evidence, an underpayment for each year in issue and that some part of the underpayment for each of those years is due to fraud.  Sec. 7454(a); Rule 142(b).  If the Commissioner establishes that any portion of the underpayment is attributable to fraud, the entire underpayment is treated as attributable to fraud and subject to a 75-percent penalty, unless the taxpayer establishes that some part of the underpayment is not attributable to fraud.  Sec. 6663(a) and (b).  The Commissioner must show that the taxpayer

intended to conceal, mislead, or otherwise prevent the collection of taxes. Katz v. Commissioner, 90 T.C. 1130, 1143 (1988).

The existence of fraud is a question of fact to be resolved upon consideration of the entire record. King's Court Mobile Home Park, Inc. v. Commissioner, 98 T.C. 511, 516 (1992). Fraud will never be presumed. Id.; Beaver v. Commissioner, 55 T.C. 85, 92 (1970). Fraud may, however, be proved by circumstantial evidence and inferences drawn from the facts because direct proof of a taxpayer's intent is rarely available. Niedringhaus v. Commissioner, 99 T.C. 202, 210 (1992). The taxpayer's entire course of conduct may establish the requisite fraudulent intent. Stone v. Commissioner, 56 T.C. 213, 223-224 (1971). Fraudulent intent may be inferred from various kinds of circumstantial evidence, or "badges of fraud", including the consistent understatement of income, inadequate records, implausible or inconsistent explanations of behavior, concealing assets, and failure to cooperate with tax authorities. Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), affg. T.C. Memo. 1984-601. An additional badge of fraud includes a taxpayer disguising nondeductible personal expenditures as business expenses. See Romer v. Commissioner, T.C. Memo. 2001-168.

Respondent points to petitioner's pattern of underreporting his income over the course of the 5 years at issue as a badge of fraud. Petitioner has conceded that he underreported his income

and overstated his deductions by $104,623 in 1999, $216,193 in 2000, $125,263 in 2001, $47,570 in 2002, and $425,906 in 2003. The pattern of understatements is evidence of fraud.

Petitioner failed to maintain records that would disclose his correct taxable income. During 4 of the 5 years at issue, deposits in amounts totaling over $2 million for which he cannot identify the sources were made to his accounts. Petitioner did not have records to justify many of the medical and business expenses he deducted or to justify the capital losses he claimed.

Further badges of fraud in this case include petitioner's failure to disclose offshore trusts used to conceal income and the accompanying record of implausible and inconsistent explanations of behavior. Petitioner failed to comply with the reporting requirements for the foreign trusts in which he had interests. Although he claims that he had no knowledge of these trusts until the audit began, his claims are not credible. Petitioner at one time worked as a stockbroker and was a sophisticated investor. By his own admission he spent a significant amount of time trading securities and watching the financial markets. We do not believe that he received millions of dollars from these trusts without knowledge of their nature.

Petitioner's wife was able to procure from his home office and turn over to the IRS documentation regarding the foreign trusts that petitioner did not supply during the audit.

Petitioner's father sought advice from petitioner about investment decisions regarding the Wheels Trust in February 1999. Additionally, petitioner changed the name of Tee Holdings to South West Coast Holdings for no apparent purpose other than to conceal the offshore funds. Petitioner's behavior with respect to the foreign trusts is evidence of the intent to avoid the payment of taxes.

Another badge of fraud is petitioner's use of nominees to hold assets. He titled the house he purchased for Rose under the name of Angel Heaven, a corporation with no purpose other than to hold that property. He purchased the ranch house he owned in Ocala under the name Oak Hill Stables despite treating the property as his own and purchased a horse trailer under his mother's name despite her ill health and inability to enjoy its use.

Petitioner used his FJR Investments account to pay personal expenses for his family, and he deducted those expenses as business expenses. FJR Investments conducted no substantial business in any of the years at issue, claiming de minimis income and thousands of dollars in expenses. Nearly all of these expenses were undeniably personal, including country club memberships, satellite television bills, and gasoline for family vehicles. He justified the diamonds he purchased for Rose with this account as an investment that required him "to buy diamonds

and actually use them in jewelry to be worn for a year before donating them to a charity that used precious stones", but never made such a donation. Petitioner's claimed losses arising from fictitious business relationships are evidence of fraud.

Petitioner claimed additional personal expenditures as theft losses and capital losses. The travel and meal expenses he deducted with respect to his dealings with Rose were plainly personal and nondeductible. Deducting such expenses under the guise of investments he never made is another clear indication of fraud.

Finally, petitioner failed to cooperate with the examining agents. As described above, petitioner either did not retain or chose not to turn over documents that would explain many of the deposits to his accounts or the expenses that he deducted. Although petitioner asserts that he believed he had complied with the terms of the LCCI, the erroneous and fraudulent amended returns, standing alone, were grounds for withdrawal of the offer.

Respondent has shown by clear and convincing evidence that petitioner intended to avoid taxes by concealing income in foreign accounts, deducting expenses he knew to be improper, and failing to comply with his reporting and documentation requirements. Petitioner's explanations and excuses are

implausible and unpersuasive.  Petitioner is liable for the fraud penalty under section 6663 for all of the years in issue.

We have considered the other arguments of the parties, and they either are without merit or need not be addressed in view of our resolution of the issues.  To reflect petitioner's and respondent's concessions,

<u>Decisions will be entered</u>

<u>under Rule 155</u>.