154 T.C. No. 12

UNITED STATES TAX COURT

JASON B. SAGE, Petitioner <u>v.</u>
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 3372-16.                                    Filed June 2, 2020.

P, a real estate developer, owned through subchapter S
corporation IDG three parcels of Oregon real estate encumbered by
liabilities in excess of their fair market values.  In response to the
2008 economic recession, IDG engaged in a series of transactions in
December 2009 designed to transfer the parcels to three separate
liquidating trusts for the benefit of the mortgage holders.  Between
2010 and 2012 the liquidating trusts disposed of the parcels, and the
mortgage holders applied the proceeds from these dispositions against
the outstanding liabilities of IDG and its wholly owned limited
liability company (LLC).

IDG reported significant losses as a result of the 2009
transactions, which losses P claimed on his 2009 individual tax
return.  These losses gave rise to a net operating loss (NOL), which P,
inter alia, carried back to his 2006 taxable year as an NOL carryback
deduction and forward to his 2012 taxable year as an NOL carryover
deduction.  R disallowed the losses reported by IDG and claimed by P
for the 2009 taxable year, made correlative adjustments to the 2006

and 2012 NOL deductions, and determined deficiencies for 2006 and 2012.

Held: As the proceeds of the Oregon parcels held by the liquidating trusts were applied to discharge certain liabilities of IDG and its wholly owned LLC between 2010 and 2012, IDG and the LLC were the owners of the corresponding liquidating trusts during those respective years pursuant to the "grantor trust" provisions. I.R.C. secs. 671-679.

Held, further, because IDG and the LLC owned the liquidating trusts beyond the close of the 2009 taxable year, the losses reported by IDG and claimed by P for 2009 were not bona fide dispositions and not "evidenced by closed and completed transactions, fixed by identifiable events, and * * * actually sustained during" that year. Sec. 1.165-1(b), Income Tax Regs. The deductions were properly disallowed.

Craig R. Berne, Milton R. Christensen, and Dan Eller, for petitioner.

Nhi T. Luu, Kelley A. Blaine, and Janice B. Geier, for respondent.

URDA, Judge: In 2009 petitioner, Jason B. Sage, an Oregon real estate developer, found himself significantly under water with respect to three parcels of land that he indirectly owned through his wholly owned companies--that is, he owed much more to his mortgage lenders than the land was worth. Facing these financial straits, Mr. Sage undertook a series of transactions to transfer the parcels

from his companies into liquidating trusts established for the benefit of his respective lenders.

Mr. Sage claimed ordinary losses from these transactions on his 2009 Federal income tax return, giving rise to a large net operating loss (NOL) for that year. He applied a portion of the NOL to his 2006 taxable year as an NOL carryback deduction and a portion to his 2012 taxable year as an NOL carryover deduction. The Internal Revenue Service (IRS) disallowed the loss claimed for 2009--thus reducing the NOL amount available to be carried to 2006 and 2012-- and determined deficiencies of $1,468,264 and $7,701 for those respective years.[1] It also determined an accuracy-related penalty for 2012.

Before this Court the parties dispute whether the transfers of the parcels to the liquidating trusts had the effect of producing the 2009 loss claimed by Mr. Sage. We conclude that they did not and will sustain the IRS' determinations.

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. All amounts are rounded to the nearest dollar.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.  The stipulations of facts and the attached exhibits are incorporated by this reference.  Mr. Sage resided in Oregon when he timely filed his petition.

I.     Mr. Sage's Real Estate Business

A.     Business Overview and 2007 Loans

During the periods relevant to this case Mr. Sage was a real estate developer operating a number of vertically integrated companies that, inter alia, purchased raw land, developed lots and subdivisions, constructed homes, and sold (or rented) the developed properties.  Among other entities, Mr. Sage owned Integrity Development Group, Inc. (IDG), a subchapter S corporation in the business of buying raw land and developing it into finished lots.  By 2007 IDG had acquired three parcels of real property outside of Portland, Oregon:  (1) the Village at Summer Creek (Village); (2) the North Plains Sunset Terrace (Plains); and (3) Gales Creek (Creek), which IDG owned through Gales Creek Terrace LLC, a single-member limited liability company that elected to be disregarded as an entity for Federal tax purposes.

During 2007 IDG took out loans of $6,160,000 and $5,060,000 from Sterling Savings Bank (Sterling), which were secured by Village and Plains,

respectively. Mr. Sage executed indemnification agreements relating to both loans as president of IDG, president of JLS Custom Homes, Inc. (another of Mr. Sage's wholly owned businesses), and on his own behalf.

The same year Gales Creek Terrace LLC took out a line of credit of $7,100,000 from Community Financial Corp. (CFC), secured by Creek. Two years earlier Mr. Sage had executed a personal guaranty agreement with CFC by which he unconditionally guaranteed payment to CFC of all obligations that Gales Creek Terrace LLC owed at that time or would incur in the future.

### B.    Worsening Economic Conditions

The national economic downturn reached Oregon soon thereafter, and Mr. Sage's real estate business was hit hard. Mr. Sage took a variety of actions to stay afloat, including cutting staff and overhead, renegotiating prices with subcontractors, slowing down construction, and putting his own money back into the companies.

Mr. Sage also negotiated with, and sought accommodation from, his lenders. He entered into two forbearance agreements with Sterling, as well as a settlement agreement releasing him from his personal obligations as guarantor for the Sterling loans in exchange for an upfront payment of $750,000 and a promissory note for another $750,000. In addition he engaged in discussions with

CFC about the financial headwinds he faced, his attempts to keep his businesses afloat, and different strategies moving forward.

## II.    Liquidating Trust Transactions

One strategy that Mr. Sage and his advisers developed during this time involved the transfer of parcels of real property into separate liquidating trusts, with each parcel's creditor named as the beneficiary of the associated trust.[2]  Mr. Sage believed that this arrangement offered advantages both for his creditors and for himself.  Specifically, Mr. Sage (and colleagues) touted that this strategy would protect his creditors' interests in the case of an involuntary bankruptcy.  For himself, Mr. Sage saw a tax benefit.

By late 2009 Village, Plains, and Creek were worth significantly less than the liabilities they secured.  Mr. Sage therefore decided to pursue his liquidating trust strategy in connection with these parcels.  He did not consult with either Sterling or CFC before electing to do so.

---

[2]As discussed in greater depth below, liquidating trusts are entities recognized as "trusts" for Federal tax purposes.  See sec. 301.7701-4(d), Proced. & Admin. Regs.  The regulations provide that, subject to certain other requirements:  "An organization will be considered a liquidating trust if it is organized for the primary purpose of liquidating and distributing the assets transferred to it, and if its activities are all reasonably necessary to, and consistent with, the accomplishment of that purpose."  Id.

To implement the liquidating trust strategy, IDG first organized three so-called project LLCs under Oregon State law:  the Village Project LLC (Village Project LLC), the North Plains Project LLC (Plains Project LLC), and the Gales Creek Terrace Project LLC (Creek Project LLC).[3]  Each project LLC, having IDG as its sole member, elected to be disregarded for Federal tax purposes.  On December 28, 2009, IDG transferred (by statutory bargain and sale deeds) Village and Plains to the correspondingly named project LLCs for a stated consideration of zero.  Gales Creek Terrace LLC made a similar transfer of Creek the same day for the same consideration (zero).  The deeds were recorded on December 31, 2009.

Also on December 31, 2009, JLS Property Management LLC (JLS)[4] established three trusts under Oregon law to house the newly created project LLCs:  the Village Project Liquidating Trust (Village Trust), the North Plains

---

[3]The articles of organization for the Village Project LLC were filed with the Oregon Secretary of State on December 18, 2009, and the articles for the Plains Project LLC and the Creek Project LLC were filed on December 29, 2009.  The operating agreements for each of the project LLCs were executed on December 31, 2009.

[4]JLS, another of Mr. Sage's companies, was wholly owned by JLS Custom Homes, Inc.

Project Liquidating Trust (Plains Trust), and the Gales Creek Terrace Project Liquidating Trust (Creek Trust). JLS was appointed sole trustee of all three trusts.

Each of the trust instruments initially identified "Indymac Federal Bank" as the beneficiary.[5] On the same day (December 31) one of Mr. Sage's associates, Ron Winter, informed Sterling by both email (time-stamped 4:52 p.m.) and letter that Mr. Sage had established the Village Trust and the Plains Trust for Sterling's benefit and requested a meeting to "go over th[ese] transaction[s] so the bank understands what we did, and how we are going to proceed from here."[6] He sent a similar notice to CFC on December 31 regarding the establishment of the Creek Trust. The trust instruments were later revised to designate Sterling as the beneficiary of the Village Trust and the Plains Trust and CFC as the beneficiary of the Creek Trust.

The governing instrument of each trust specified that it was intended to qualify as a liquidating trust within the meaning of section 301.7701-4(d), Proced.

---

[5]In addition to incorrectly identifying its beneficiary, the Creek Trust instrument incorrectly stated that IDG had deeded real property to the Creek Project LLC. Gales Creek Terrace LLC, not IDG, deeded Creek to the Creek Project LLC.

[6]A Sterling employee responded to Mr. Winter's message by email on the morning of January 4, 2010, stating that "ownership changes do not absolve the guarantors of their obligations under the loan documents".

& Admin. Regs. The trust documents further provided that the trusts had been established for the sole purpose of liquidating the assets transferred to them for the benefit of the creditor-beneficiary, and that they had no objective or authority to pursue any trade or business activity beyond what was necessary to accomplish that purpose.

Against this backdrop the trust instruments recited that IDG would transfer ownership of the project LLCs to the trusts for the purpose of liquidating Village, Plains, and Creek for the benefit of Sterling (in the case of the Village Trust and the Plains Trust) and CFC (in the case of the Creek Trust). They further specified that the parties to each trust would "treat" the foregoing transfer for Federal tax purposes as (1) first a transfer by IDG of the respective project LLC membership units to the creditor-beneficiary (i.e., Sterling or CFC), immediately followed by (2) a transfer by that creditor-beneficiary of the membership units to the respective trust in exchange for a beneficial interest in that trust.

On the same day the trusts were established (that is, December 31, 2009), IDG transferred its ownership of the project LLCs to the trusts. IDG did not receive any consideration, whether in the form of cash, property, or relief from indebtedness, for these transfers. Each project LLC's operating agreement was

accordingly amended to substitute the corresponding trust for IDG as the project LLC's sole member.

The end result of these transactions was that Village, Plains, and Creek were each held by the respectively named trusts. Despite the ownership changes IDG and Gales Creek Terrace LLC remained liable to Sterling and CFC under the respective loans. In applying for an exemption from a county transfer tax relating to Village, Mr. Sage stated that the property was "not being sold, but simply transferred to another wholly owned entity" with "no transfer of debt", in order to "create a liability protection entity".

III.    Subsequent Dispositions of the Properties

After the 2009 transactions, Mr. Sage and his companies continued to manage and market Village, Plains, and Creek. After 2009 IDG did not retain the properties as assets on its books but reported the remaining unsatisfied loan balances as liabilities on its financial reports. Village was sold in 2010 for $3,469,390, while Plains was sold in 2012 for $350,000. The net proceeds from these sales were then distributed to Sterling, which in turn credited the distributed amounts against IDG's outstanding loans.

Things went differently with Creek. For a time the Creek Trust collected and reported rental income from the property. But in February of 2010 CFC

issued a demand letter to Gales Creek Terrace LLC (and to Mr. Sage as guarantor), which led to negotiations between Mr. Sage and CFC's president. These discussions spilled over into 2011, culminating in a "workout and shortfall agreement", executed on April 6, 2011, under which Mr. Sage (in his personal capacity and as president of IDG, the sole member of Gales Creek Terrace LLC) agreed to (1) transfer $200,000 in cash along with a promissory note for an additional $400,000 to CFC and (2) cause Creek Project LLC to transfer Creek to CFC by deed in lieu of foreclosure in exchange for settlement of Gales Creek Terrace LLC's CFC debt.[7]

## IV.    2009 Tax Returns and IRS Examination

IDG filed a Form 1120S, U.S. Income Tax Return for an S Corporation, for its 2009 taxable year. On that return IDG reported ordinary losses stemming from the transfers of Village, Plains, and Creek to the trusts of $5,450,154, $1,105,956, and $2,574,470, respectively.[8] In total (from these and other transactions) IDG

---

[7]The deed in lieu of foreclosure attached to the workout agreement was signed by Mr. Sage in his capacity as president of IDG. Although the deed reflected that IDG was a member of the Creek Project LLC, IDG had previously transferred its membership units in that entity to the Creek Trust on December 31, 2009.

[8]These sums represent IDG's calculation of the difference between its adjusted tax bases in Village, Plains, and Creek (of $7,914,154, $1,605,956, and

(continued...)

reported an ordinary business loss of $8,061,293 in the Schedule K-1, Shareholder's Share of Income, Deductions, Credits, etc., included with its 2009 return. Pursuant to section 1366, IDG's ordinary loss flowed through to Mr. Sage.

On Mr. Sage's 2009 Form 1040, U.S. Individual Income Tax Return, he claimed a total nonpassive loss of $10,489,926 flowing through to his return from his various companies. Of that sum, $5,310,826 was attributable to IDG.[9] The losses claimed on Mr. Sage's 2009 return gave rise to an NOL, which he carried back to prior years, including his 2006 taxable year, as well as forward to future years, including his 2012 taxable year. The NOL carried back to 2006 and forward to subsequent years resulted in significant refunds, which Mr. Sage used to pay off debts and interest due on various loans owed by his companies.

The IRS examined the returns filed by Mr. Sage and IDG for 2009 and determined that the losses reported by IDG (and claimed by Mr. Sage) for that year with respect to the trust transactions should be disallowed because they were

---

[8](...continued)
$3,169,041, respectively) on December 31, 2009, and its estimates of the fair market values of those properties (of $2,464,000, $500,000, and $594,571, respectively) as of that date.

[9]Although IDG reported ordinary business losses of $8,061,293 on its 2009 return, sec. 1366(d)(1) limited the "aggregate amount of losses and deductions" that Mr. Sage could take into account to the sum of (1) the adjusted basis of his stock in IDG and (2) his adjusted basis in any indebtedness of IDG to him.

"attributable solely to nonbusiness expenses" of IDG. That disallowance significantly reduced Mr. Sage's allowable NOL amount for 2009--the basis for his 2006 and 2012 NOL deductions.

The IRS subsequently issued to Mr. Sage two statutory notices of deficiency consistent with the foregoing determinations. As relevant to the instant case, the first notice, dated November 12, 2015, determined an income tax deficiency of $1,468,264 for 2006. The second, dated December 22, 2015, determined an income tax deficiency of $7,701 and an accuracy-related penalty for an underpayment of tax attributable to a substantial understatement of income tax under section 6662(a) and (b)(2) of $1,540 for 2012.[10]

Mr. Sage filed a timely petition in this Court seeking redetermination of the deficiencies and penalty set forth in the notices of deficiency.

## OPINION

In general, a taxpayer seeking to challenge the IRS' determinations in a notice of deficiency bears the burden of proving those determinations incorrect. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). The Commissioner

---

[10]The immediate supervisor of the revenue agent who made the initial determination to assert the sec. 6662 penalty against Mr. Sage for his 2012 taxable year signed an approval form with respect to that penalty before the issuance of the December 2015 notice of deficiency.

bears the burden of proof, however, with respect to any "new matter" he raises. See Rule 142(a)(1). He will be considered to have raised a new matter when the basis or theory upon which he relies was not stated in the notice of deficiency and the new theory or basis requires the presentation of different evidence. Shea v. Commissioner, 112 T.C. 183, 197 (1999).

Respondent concedes on brief that he has raised a new matter that was not laid out in either notice of deficiency issued to Mr. Sage. Specifically the notice of deficiency for 2006 indicates that the IRS disallowed the underlying loss on the ground that it "was attributable solely to nonbusiness expenses." At trial and in his briefs, however, respondent asserted a new theory for the disallowance of IDG's loss: namely, that the 2009 trust transactions were not "closed and completed transactions" capable of producing realizable losses for that year. He accordingly bears the burden of proof with respect to the deficiencies determined for Mr. Sage's 2006 and 2012 taxable years.[11]

---

[11]Respondent also has conceded, in light of a revised report prepared by one of his revenue agents, that the income tax deficiency determined for Mr. Sage's 2006 taxable year should instead be $1,414,176. For his part, Mr. Sage concedes that if we hold for respondent on the loss issue, he will be liable for the accuracy-related penalty.

I.      Preliminary Matters

        A.      Evidentiary Rulings

At trial and in his briefs Mr. Sage objected to 12 proposed exhibits (Exhibits 21-R and 24-R through 34-R), as well as paragraph 93 of the stipulation.  Mr. Sage objected on the ground of relevance to each and also asserted that certain of the exhibits (Exhibits 33-R and 34-R) and the stipulation paragraph constituted improper expert testimony.  Mr. Sage further objected to Exhibits 21-R and 32-R on hearsay grounds.

We first turn to relevance.  Tax Court proceedings are conducted in accordance with the Federal Rules of Evidence.  See sec. 7453; Rule 143.  Rule 401 of those rules provides that "[e]vidence is relevant if:  (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."  The relevance bar is a low one.  See, e.g., Crawford v. City of Bakersfield, 944 F.3d 1070, 1077 (9th Cir. 2019); United States v. Durham, 902 F.3d 1180, 1225 (10th Cir. 2018); CNT Inv'rs, LLC v. Commissioner, 144 T.C. 161, 191 n.32 (2015); see also Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 587 (1993).

We will overrule all of Mr. Sage's relevance objections, except his objection to Exhibit 33-R.  Exhibit 21-R details the status of the CFC loan

(relating to Creek) in September 2009, thus providing insight into the financial state of that property shortly before the liquidating trust transactions. Exhibits 24-R through 32-R relate to previous liquidating trust transactions by Mr. Sage, which supply context for the transactions at issue. Exhibit 34-R likewise provides relevant information regarding Sterling's dealings with Mr. Sage before he put his liquidating trust transactions into motion. And the stipulation paragraph relates to the ultimate disposition of trust assets by sale, which is very relevant to our analysis. We conclude, however, that Exhibit 33-R is not relevant as it relates exclusively to Sterling's internal view of a 2008 transaction and has no bearing on 2009.

We will also overrule Mr. Sage's objection that Exhibit 34-R and stipulation paragraph 93 constitute improper expert testimony. Exhibit 34-R contains notes summarizing Sterling's view of its business with Mr. Sage in 2009, and we will accept it as such. And we see no improper expert testimony in the stipulation paragraph, which merely states that Sterling applied the proceeds of the sale of Plains against IDG's loan and that the loan has yet to be fully paid.

Finally, we will overrule Mr. Sage's hearsay objections. Exhibit 21-R is not accepted for the truth of the representations therein but simply to illustrate CFC's view of the Creek loan before Mr. Sage decided to implement the liquidating trust

transaction. Likewise Exhibit 32-R provides context for Mr. Sage's actions in 2009, and we accept it for that limited reason.

B.    Loss and NOL Deductions

Section 165(a) permits a deduction for "any loss sustained during the taxable year and not compensated for by insurance or otherwise." To be allowable as a deduction under section 165(a), "a loss must be evidenced by closed and completed transactions, fixed by identifiable events, and * * * actually sustained during the taxable year." Sec. 1.165-1(b), Income Tax Regs. "In most cases a 'closed and completed transaction[]' will occur upon a sale or other disposition of property", although this requirement may be satisfied in some instances "if the taxpayer abandons an asset or the asset becomes worthless." Tucker v. Commissioner, T.C. Memo. 2015-185, at *10-*11 (alteration in original), aff'd, 841 F.3d 1241 (11th Cir. 2016). The year for which a taxpayer can claim a loss deduction evidenced by a closed and completed transaction is a question of fact. Forlizzo v. Commissioner, T.C. Memo. 2018-137, at *8; see Boehm v. Commissioner, 326 U.S. 287, 293 (1945).

Section 1.165-1(b), Income Tax Regs., further specifies that "[o]nly a bona fide loss is allowable." In determining the deductibility of a loss, "[s]ubstance and not mere form shall govern". Id. These requirements call for a practical test,

rather than a legal one, and turn on the particular facts of each case. Boehm v.
Commissioner, 326 U.S. at 293; Lucas v. Am. Code Co., 280 U.S. 445, 449
(1930); Ence v. Commissioner, T.C. Memo. 2018-151, at *5.

Where the deductions allowed to a taxpayer for a given year exceed his
gross income for that year, the taxpayer has an NOL as defined by section 172(c).
Generally, section 172(b)(1)(A) permits a taxpayer to apply an NOL to other
taxable years by first carrying back the NOL to the two taxable years preceding the
year in which the NOL was generated and then by carrying over any unused
portion of the NOL to the 20 years that follow. For taxable years ending after
December 31, 2007, and beginning before January 1, 2010, the carryback period
for certain NOLs was increased to three, four, or five years. Sec. 172(b)(1)(H).[12]
Section 172(a) provides for an NOL deduction for a given year equaling the
aggregate of a taxpayer's NOL carryovers and his NOL carrybacks.

Mr. Sage asserts that IDG is entitled to a deduction under section 165 (from
which the 2006 and 2012 NOL deductions at issue derive) because the transfers of

---

[12]The Worker, Homeownership, and Business Assistance Act of 2009, Pub.
L. No. 111-92, sec. 13(a), 123 Stat. at 2992, "amended sec. 172(b)(1)(H)(i) to
permit a taxpayer to elect to carry back a net operating loss for the 2009 tax year to
three, four, or five years instead of the usual two years." Tucker v. Commissioner,
T.C. Memo. 2015-185, at *8 n.5, aff'd, 841 F.3d 1241 (11th Cir. 2016). The
beneficial treatment extended to 2009 NOLs provides perspective into the flurry of
activity by Mr. Sage's companies in late December 2009.

Village, Plains, and Creek to the trusts for the benefit of the lenders were bona fide

dispositions of property that generated actual losses.  Mr. Sage's argument hinges

on the nature of the relationship between IDG (or Gales Creek Terrace LLC in the

case of Creek) and the respective liquidating trust and implicates the Code's

"grantor trust" provisions, sections 671 through 679.[13]

## II.     Characterization of the Trusts

### A.      Governing Framework

Section 671 provides that where a grantor of a trust or another person is

treated as the owner of any portion of a trust, "there shall then be included in

computing [its] * * * taxable income and credits * * * those items of income,

deductions, and credits against tax of the trust which are attributable to that

portion of the trust to the extent that such items would be taken into account under

this chapter in computing taxable income or credits against the tax of an

individual."  The "grantor of a trust is treated as the owner of that trust if certain

conditions specified in" sections 673 through 678 exist.[14]  Holman v. United

---

[13]We assume for the purposes of the instant analysis that the Village Trust, the Plains Trust, and the Creek Trust each qualifies as a trust under Oregon law. We do not address respondent's State law arguments attacking the validity of the trusts.

[14]The term "grantor" includes any party that creates a trust or directly (or

(continued...)

States, 728 F.2d 462, 464 (10th Cir. 1984); see also Gould v. Commissioner, 139 T.C. 418, 435 (2012), aff'd, 552 F. App'x 250 (4th Cir. 2014). These "grantor trust" provisions enunciate "rules to be applied where, in described circumstances, a grantor has transferred property to a trust but has not parted with complete dominion and control over the property or the income which it produces." Scheft v. Commissioner, 59 T.C. 428, 430 (1972) (fn. ref. omitted); see also Gould v. Commissioner, 139 T.C. at 435; Wesenberg v. Commissioner, 69 T.C. 1005, 1012 (1978); Rahall v. Commissioner, T.C. Memo. 2011-101, 101 T.C.M. (CCH) 1486, 1490-1491 (2011).[15] Although several of the grantor trust rules are framed in terms of trust "income", section 1.671-2(b), Income Tax Regs., clarifies that "it is ordinarily immaterial whether the income involved constitutes income or corpus

---

[14](...continued)
indirectly) makes a gratuitous transfer--that is, a transfer other than for fair market value--of property to the trust. Sec. 1.671-2(e)(1) and (2)(i), Income Tax Regs. A partnership or a corporation making a gratuitous transfer to a trust for a business purpose of that partnership or corporation will also be a grantor of the trust. Id. subpara. (4).

[15]Application of the grantor provisions does not preclude the Commissioner's use of sham trust theories, the reciprocal-trust doctrine, or assignment of income principles. See, e.g., Markosian v. Commissioner, 73 T.C. 1235, 1244-1245 (1980); Krause v. Commissioner, 57 T.C. 890, 901 (1972), aff'd, 497 F.2d 1109 (6th Cir. 1974); Snyder v. Commissioner, T.C. Memo. 2001-255, 82 T.C.M. (CCH) 651, 658 (2001). Respondent has chosen not to pursue those theories in this case, however.

for trust accounting purposes" in light of the general objectives of the grantor trust rules. Cf. Madorin v. Commissioner, 84 T.C. 667, 677-678 (1985) (noting that the attribution of ownership under the grantor trust scheme may extend to both trust income and trust corpus).

"The grantor trust provisions can be viewed as a series of obstacles, each with conditions that can cause a grantor to be treated as owner of trust property." Boris I. Bittker & Lawrence Lokken, Federal Taxation of Income, Estates and Gifts, para. 80.1.1, at 80-8 (3d ed. 2003). These provisions apply if their conditions are met, regardless of the existence of a bona fide nontax reason for creating the trust. Luman v. Commissioner, 79 T.C. 846, 853 (1982).

As most relevant here, section 677(a)(1) considers a grantor the owner of any portion of a trust "whose income without the approval or consent of any adverse party is, or, in the discretion of the grantor or a nonadverse party, or both, may be" distributed to him or his spouse.[16] Section 677(a) generally encompasses

---

[16]An "adverse party" is any person who has "a substantial beneficial interest in the trust which would be adversely affected by the exercise or nonexercise of the power which he possesses respecting the trust." Sec. 672(a). The term "nonadverse party" refers to any person that is not an "adverse party". Sec. 672(b). Adversity is a question of fact determined in each case by reference to the particular interest created by the trust instrument. See Vercio v. Commissioner, 73 T.C. 1246, 1256-1257 (1980); Paxton v. Commissioner, 57 T.C. 627, 631 (1972), aff'd, 520 F.2d 923 (9th Cir. 1975).

the portion of any trust "whose income is, or in the discretion of the grantor or a nonadverse party, or both, may be applied in discharge of a legal obligation of the grantor". Sec. 1.677(a)-1(d), Income Tax Regs.

This Court has held that an "owner" under the grantor trust scheme is an owner in the usual, ordinary, and everyday sense of the word. Madorin v. Commissioner, 84 T.C. at 671. In so holding we observed that while "[s]ection 671 specifies one result of being an 'owner,' * * * it does not specifically limit the meaning to that result." Id. at 672. And because ownership under the grantor trust regime results in the attribution of income directly to the owner, "the Code, in effect, disregards the trust entity." Id. at 675. Consequently, if a trust grantor is deemed an owner, the trust "is not treated as a separate taxable entity for Federal income tax purposes to the extent of the grantor's retained interest." Gould v. Commissioner, 139 T.C. at 435. To put it another way, when the grantor trust provisions apply, they function to "look through" the trust form and ignore the "owned" portion of the trust for Federal tax purposes as existing separately from the grantor. See Madorin v. Commissioner, 84 T.C. at 671; Estate of O'Connor v. Commissioner, 69 T.C. 165, 174 (1977); see also Reddam v. Commissioner, 755 F.3d 1051, 1055 n.5 (9th Cir. 2014), aff'g T.C. Memo. 2012-106; Samueli v. Commissioner, 661 F.3d 399, 403 n.4 (9th Cir. 2011), aff'g in part, remanding in

part 132 T.C. 37 (2009); First Chi. NBD Corp. v. Commissioner, 135 F.3d 457, 460 (7th Cir. 1998), aff'g 96 T.C. 421 (1991).

B.    Analysis

Under the specific facts of this case, section 677(a)(1) and its accompanying regulations compel the conclusions that (1) IDG was the owner of Village and Plains in 2010 and 2012, respectively, and Gales Creek Terrace LLC was the owner of Creek in 2011, and (2) the Village Trust and the Plains Trust were not separate taxable entities from IDG, and the Creek Trust was not a separate taxable entity from Gales Creek Terrace LLC, during those years.  These twin conclusions preclude the tax treatment Mr. Sage seeks.

As an initial matter, IDG and Gales Creek Terrace LLC were grantors of the respective trusts.  IDG was a grantor of the Village Trust and the Plains Trust by virtue of its direct gratuitous transfer of ownership of the project LLCs (which in turn held the properties) to the trusts.  Sec. 1.671-2(e)(1), Income Tax Regs.  For its part Gales Creek Terrace LLC was a grantor of the Creek Trust because of its indirect gratuitous transfer of Creek to the Creek Trust (through its contribution of Creek to the Creek Project LLC).  See id.

As explained above, the grantor of a trust is treated as an owner where, inter alia, trust income is "applied in discharge of a legal obligation of the grantor".

Sec. 1.677(a)-1(d), Income Tax Regs. Income, in this regard, includes the trust corpus. Sec. 1.671-2(b), Income Tax Regs.

The parties before us agree that IDG and Gales Creek Terrace LLC remained liable to Sterling and CFC, respectively, for the loans secured by Village, Plains, and Creek after the ownership of those properties had passed to the respective trusts. When Village was sold in 2010 for $3,469,390 and Plains was sold in 2012 for $350,000, the proceeds were distributed to Sterling, which credited the amounts against IDG's outstanding loans secured by those respective properties. For its part, Creek was transferred to CFC in 2011 in partial satisfaction of Gales Creek Terrace LLC's loan.

As the corpus of each trust was used to satisfy the legal obligations of IDG or Gales Creek Terrace LLC, we conclude that they were owners of the respective trusts after 2009, and that the trusts therefore were not separate taxable entities as to them. See sec. 1.677(a)-1(d), Income Tax Regs.; see also Gould v. Commissioner, 139 T.C. at 435; Madorin v. Commissioner, 84 T.C. at 671. The 2009 transfers accordingly did not accomplish bona fide dispositions of the

property evidenced by closed and completed transactions as necessary to support the losses ultimately reported by IDG and passed on to Mr. Sage.[17]

### C. Mr. Sage's Contentions

Mr. Sage counters that the application of the grantor trust provisions in this case requires that Sterling and CFC be considered the owners of the respective trusts, not IDG and Gales Creek Terrace LLC. He first argues that this result is required by the nature of a liquidating trust.[18] In a slightly different vein he also

---

[17]In his briefs Mr. Sage argues that the lenders had no legal obligation to apply any income realized from the properties to satisfy the debt of IDG or Gales Creek Terrace LLC. This point is of no moment given that the trust corpus was used in fact to pay these obligations. Even setting aside that fact and, further, assuming arguendo that the lenders had discretion as Mr. Sage suggests, the trusts nonetheless would constitute grantor trusts because they were trusts "whose income * * *, in the discretion of * * * a nonadverse party * * * may be applied in discharge of a legal obligation of the grantor". Sec. 1.677(a)-1(d), Income Tax Regs. (emphasis added). The respective trust documents require the distribution of all net trust income and all net proceeds from the sale of trust assets to Sterling and CFC. Although trust beneficiaries are ordinarily considered adverse parties, sec. 1.672(a)-1(b), Income Tax Regs., a party "can hardly be considered adverse regarding distributions for * * * [its] benefit", Luman v. Commissioner, 79 T.C. 846, 854 (1982); see also Vercio v. Commissioner, 73 T.C. at 1258. Sterling and CFC, two nonadverse parties, had unfettered discretion to apply trust income and sale proceeds to satisfy the legal obligations of IDG and Gales Creek Terrace LLC. Of course that is precisely what the lenders did.

[18]Assuming that the trusts at issue here qualify as trusts under Oregon law, we conclude that they were "liquidating trusts" within the meaning of sec. 301.7701-4(d), Proced. & Admin. Regs. The express terms of each trust instrument comported with the requirements of that regulation, the record reflects

(continued...)

contends that section 1.671-2(e)(3), Income Tax Regs., should be read to mean that Sterling and CFC were owners of the respective trusts by virtue of their status as trust beneficiaries. We find neither argument persuasive.

### 1. Liquidating Trust Argument

Mr. Sage contends that the nature of liquidating trusts compels the conclusion that Sterling and CFC were the true owners of the respective trusts beginning in 2009. Mr. Sage asserts that the creation of the liquidating trusts here implicitly involved two steps: (1) the transfer of property from IDG to Sterling or CFC and (2) the transfer of property from Sterling or CFC to the respective trust. According to Mr. Sage, the first step is tantamount to a sale, and IDG should be able to recognize a loss equaling the difference between IDG's adjusted basis in the respective piece of property and its fair market value--as unilaterally determined by Mr. Sage, apparently--on December 31, 2009.

This argument has no foundation in either the Code or the applicable regulations. As an initial matter the Code does not specifically address liquidating trusts whatsoever and thus provides no support for Mr. Sage's view.

---

[18](...continued)
that the trusts abided by those requirements, and respondent has not meaningfully contested their treatment as such.

Nor do the applicable regulations. Section 301.7701-4(d), Proced. & Admin. Regs., defines a liquidating trust as "organized for the primary purpose of liquidating and distributing the assets transferred to it," with all activities "reasonably necessary to, and consistent with, the accomplishment of that purpose." Paragraph (d) further specifies that such liquidating trusts "are treated as trusts for purposes of the Internal Revenue Code." Id. The regulations, like the Code, offer no hint that liquidating trusts incorporate an implicit two-step structure or that they provide a safe harbor from the normal operation of the grantor trust rules.

Mr. Sage places his hopes in IRS administrative guidance that addresses certain liquidating trust arrangements. This administrative guidance, however, does not weigh in favor of Mr. Sage's view of liquidating trusts.[19]

Mr. Sage principally relies on a 2001 Chief Counsel Advisory (CCA), 200149006, 2001 WL 1559018 (Dec. 7, 2001), which sets forth the Commissioner's views on a proposed chapter 11 bankruptcy plan. The plan

---

[19]As will be discussed, Mr. Sage relies on a Chief Counsel Advisory memorandum and certain revenue rulings. This type of memorandum is non-precedential but may provide some insight into IRS policy. See Hulett v. Commissioner, 150 T.C. 60, 86 n.21 (2018), appeal filed (8th Cir. Oct. 19, 2018); Dover Corp. & Subs. v. Commissioner, 122 T.C. 324, 341 n.11 (2004). Revenue rulings likewise are not binding on the courts. N. Ind. Pub. Serv. Co. v. Commissioner, 105 T.C. 341, 350 (1995), aff'd, 115 F.3d 506 (7th Cir. 1997).

proposed placing certain assets in a liquidating trust for the benefit of holders of allowed claims. See id. The CCA provides that "[g]enerally, liquidating trusts are taxed as grantor trusts with the creditors treated as the grantors and deemed owners" under the theory that "the debtor transferred its assets to the creditors in exchange for relief from its indebtedness to them, and that the creditors then transferred those assets to the trust for purposes of liquidation." Id.

In our case, however, apparently neither Sterling nor CFC was aware of the creation of the liquidating trusts before receiving the notifications sent by Mr. Winter in the late afternoon of December 31, 2009, much less agreed to relieve IDG or Gales Creek Terrace LLC from its respective indebtedness in exchange for the assets that were transferred to the liquidating trusts. The predicate underlying the CCA is simply not present, and this administrative guidance offers no insight here.

Mr. Sage next turns to a string of revenue rulings. See Rev. Rul. 72-137, 1972-1 C.B. 101; see also Rev. Rul. 80-150, 1980-1 C.B. 316; Rev. Rul. 75-379, 1975-2 C.B. 505; Rev. Rul. 63-245, 1963-2 C.B. 144. In each, a corporation had enacted a plan of complete liquidation that required distribution of all assets within 12 months. With the consent of the shareholders in each instance, certain assets not readily disposed of were placed in liquidating trusts for the

shareholders' benefit.  The Commissioner concluded that placing such assets in liquidating trusts complied with the requirement of divestment within 12 months because the shareholders had essentially received the assets that were transferred to the trusts.

Again, Mr. Sage's unilateral transactions in which he placed properties in trusts without any involvement from the beneficiaries does not resemble the factual situations addressed in the revenue rulings.  And we see nothing in them to suggest that liquidating trusts qua liquidating trusts should be treated differently under the grantor trust rules absent the involvement of the beneficiaries.[20]

2.     Interest Received from the Grantor of a Liquidating Trust

Mr. Sage further argues that Sterling and CFC were grantors of the trusts under section 1.671-2(e)(3), Income Tax Regs., which provides that the term "grantor" includes any person "who acquires an interest in a trust from a grantor of the trust if the interest acquired is an interest in * * * liquidating trusts described

---

[20]Mr. Sage argues in a footnote that the lenders ratified the liquidating trust transactions by not filing suit or taking other action to overturn or void them.  In support Mr. Sage relies upon an Oregon case addressing ratification of an agent's actions by a principal.  Lemley v. Lemley, 188 P.3d 468, 473-475 (Or. Ct. App. 2008).  Lemley plainly has no applicability here.  In any event, the record before us shows that both Sterling (in the January 2010 email from a Sterling employee) and CFC (in its February 2010 demand letter) notified Mr. Sage that they did not view the liquidating trust transactions as having any practical effect.

in § 301.7701-4(d) of this chapter". According to Mr. Sage, Sterling and CFC "acquire[d]" interests by virtue of being named beneficiaries and, therefore, are grantors.

We are unconvinced. The only example in the regulations illustrating the operation of section 1.671-2(e)(3), Income Tax Regs., refers to the acquisition of a pre-existing grantor's interest after the formation of the trust: "A makes an investment in a fixed investment trust, T, that is classified as a trust under § 301.7701-4(c)(1) of this chapter. A is a grantor of T. B subsequently acquires A's entire interest in T. Under paragraph (e)(3) of this section, B is a grantor of T with respect to such interest." Sec. 1.671-2(e)(6), Example (2), Income Tax Regs. Moreover, if Mr. Sage is right on this point, every beneficiary of a liquidating trust is automatically a grantor, with the tax repercussions that follow. If the regulations intended such a sea change, we believe that they would say so

directly.[21]  See Time Ins. Co. v. Commissioner, 86 T.C. 298, 320 (1986);

Bituminous Cas. Corp. v. Commissioner, 57 T.C. 58, 83 (1971).

D.    Conclusion

As explained above, the grantor trust provisions dictate that IDG and Gales

Creek Terrace LLC be treated as the owners of the respective trusts at issue

beyond the close of 2009.  IDG's transfers of the properties to the trusts thus did

not produce losses realized in 2009.  We will sustain the IRS' deficiency

determinations for Mr. Sage's 2006 and 2012 taxable years (as modified by

respondent's concession).

III.   Accuracy-Related Penalty

Mr. Sage has conceded that if we resolved the loss issue in respondent's

favor, he would be liable for a $1,540 accuracy-related penalty under section 6662

---

[21]We further observe that, even assuming that Mr. Sage's reading of sec. 1.671-2(e)(3), Income Tax Regs., were correct (i.e., Sterling and CFC were grantors), the result in this case would not change.  The grantor trust regime contemplates the possibility for multiple grantors to be treated as the owners of a single trust.  See, e.g., sec. 1.671-4(b)(3), Income Tax Regs. (prescribing certain reporting obligations for trustees "[i]n the case of a trust all of which is treated as owned by two or more grantors or other persons").  Mr. Sage fails to show that the banks' status as grantors has any effect on our analysis as to IDG and Gales Creek Terrace LLC.

for his 2012 taxable year.  We accordingly sustain the penalty determination for that year.[22]

IV.    Conclusion

In sum, we hold that Mr. Sage is liable for income tax deficiencies for his 2006 and 2012 taxable years.  We further conclude that he is liable for an accuracy-related penalty under section 6662 for his 2012 taxable year.

To reflect the foregoing,

Decision will be entered under

Rule 155.

---

[22]The Commissioner normally bears the burden of production with respect to an individual taxpayer's liability for, inter alia, any penalty.  See sec. 7491(c); Higbee v. Commissioner, 116 T.C. 438, 446-447 (2001).  Consideration of that burden of production is unnecessary where, as here, the taxpayer concedes the penalty.  See Frost v. Commissioner, 154 T.C. ___, ___ (slip op. at 20) (Jan. 7, 2020).